### KOY v. SCHNEIDER, Tax Collector.
### (No. 3359.)

(Supreme Court of Texas.   April 21, 1920.)

**1. Elections ☞5—Power of Legislature to regulate suffrage restricted only by organic law.**

The Legislature, subject to restrictions of organic law, the federal and state Constitutions, has full power and authority to deal as it may see fit with subject of suffrage at any election which may be required or authorized by law.

**2. Constitutional law ☞14—Statutes ☞174, 175—Ambiguous language calls for "construction."**

Where language of Constitution or statute is ambiguous, "construction" thereof becomes necessary; the process or art of determining the sense, real meaning, or proper explanation of obscure or ambiguous terms or provisions.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Construction.]

**3. Constitutional law ☞20—Court should regard legislative construction.**

Due consideration and weight, though not necessarily conclusive force, should be given a construction placed by Legislature on state Constitution.

**4. Statutes ☞219—Executive construction of "ambiguous" statute followed, unless clearly wrong.**

Where statute is "ambiguous"—that is, open to construction—construction given it by head of executive department of state government will be followed by courts, and upheld, unless clearly erroneous.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Ambiguous.]

**5. Constitutional law ☞50—Power of Legislature restricted only by federal and state Constitutions.**

The general power of the Legislature of Texas is restricted only by the Constitutions of the United States and of the state.

**6. Statutes ☞212—Courts must assume familiarity of Legislature with previous decisions.**

Courts must assume that, in enacting statute, Legislature was familiar with previous decisions of Supreme Court affecting subject-matter.

**7. Constitutional law ☞48—Act not clearly unconstitutional should be upheld.**

Court should uphold a statute as valid, unless clearly unconstitutional; every intendment and presumption being in favor of constitutionality.

**8. Elections ☞9, 126(4)—Statute providing women may vote at primary elections valid.**

Under Acts 35th Leg. (1918) c. 34, women may vote at primary elections; such act not violating Const. art. 6, § 2, making only male persons qualified electors at elections within the state, since the word "elections," in the Constitution, refers only to governmental elections, and not to preliminary and nongovernmental activities, like primary elections.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Election.]

**9. Statutes ☞181(1)—Construction is to ascertain intent.**

In construing statute, purpose is to ascertain legislative intent.

**10. Statutes ☞226—Adopted statute similarly construed.**

When the Legislature brings over from a sister state and adopts in identical or similar terms a statute which has been construed in such state, courts of Texas customarily apply same construction to it.

**11. Constitutional law ☞21—Adopted provision similarly construed.**

Where one state adopts a constitutional provision of another, after such provision has received judicial construction, it will be construed likewise in the adopting state.

**12. Courts ☞95(2) — Subsequent constructions by courts of other states of adopted suffrage clause persuasive.**

When suffrage clause is imported literally or substantially into a state Constitution from Constitutions of other states, though prior to construction thereof by courts of such other states, subsequent constructions by such courts are strongly persuasive of sense in which clause was incorporated into organic law of adopting state.

**13. Constitutional law ☞70(3)—Courts not concerned with policy of act.**

Courts are not concerned with question whether a statute conserves a wise public policy.

**14. Elections ☞3—"Governmental elections" defined.**

"Governmental elections," unlike primary elections or conventions, are elections, such as general elections, which directly and finally affect all the people of the included territory, and determine finally who shall hold public office, or whether a particular governmental policy shall prevail.

**15. Constitutional law ☞22 — Constitution speaks from date of adoption at polls.**

The state Constitution, adopted at the polls February 15, 1876, speaks from that date.

**16. Elections ☞7—Constitutional restrictions not applicable indiscriminately to all elections.**

Not all restrictions which Constitution of Texas imposes on legislative action concerning elections are applicable indiscriminately to all elections; whether a particular restriction is applicable to a particular election depending on character of election.

**17. Appeal and error ☞861—Supreme Court confines answer to question certified.**

It is statutory and settled practice in Supreme Court to confine its answer strictly to

☞For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

the very question certified to it by a Court of Civil Appeals under Rev. St. 1911, art. 1619.

**18. Citizens ⬅➡2—Constitutional law ⬅➡82— Elections ⬅➡1, 59—Women "citizens," within Bill of Rights, though not necessarily entitled to vote.**

Women are "citizens," within Bill of Rights of Constitution of Texas, though citizenship does not necessarily carry privilege of suffrage.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Citizen.]

**19. Constitutional law ⬅➡68(1)—Regulation of party primaries and conventions legislative matters.**

Whether purely party affairs, such as primary elections and conventions, should be regulated, and extent of any regulation, so long as reasonable, are peculiarly legislative matters, involving issues of public policy beyond concern of courts.

**20. Elections ⬅➡5—Power of Legislature to regulate suffrage is restricted by Constitution.**

Suffrage clause of state Constitution being restrictive in its operation, its legal effect is to deprive Legislature of authority to take from or add to specified qualifications of electors in any election to which clause applies.

**21. Constitutional law ⬅➡21 — Framers presumed to have known phraseology of Constitutions of other states.**

It is to be presumed that provision of existing Constitutions of other states, extending meaning of "elections" to make suffrage clause or provision expressly include elections then or thereafter authorized by law, whether strictly governmental elections or not, were known to framers of Constitution of Texas in adopting a suffrage clause, but without tue extension of meaning.

**22. Constitutional law ⬅➡12—Provisions restrictive of legislative power strictly construed.**

Just as liberal rule is generally applied in construction and enforcement of remedial statutes and Constitutions, stricter rule is applied when question is as to restrictive · effect on legislative power of provisions of state Constitution.

**23. Elections ⬅➡60—Suffrage clause of Constitution not remedial, to call for liberal construction.**

The suffrage clause of Const. art. 6, § 2, restricting to males privilege of voting in any election within its legal effect and operation, is not in any legal sense remedial, and does not require on that ground a liberal construction.

**24. Constitutional law ⬅➡22 — Words speak from date of original insertion in organic law.**

Words in a Constitution speak from date of original insertion, unless it be provided otherwise; but words may be used in a sense broad enough to include things not at the time within human experience.

Phillips, C. J., dissenting.

On motion for rehearing. Motion overruled.

For former opinion, see 218 S. W. 479.

HAWKINS, J. Is the Limited Woman's Suffrage Act of 1918 (chapter 34, p. 61), which seeks to confer upon women the privilege of voting in primary elections and in primary conventions, violative of section 2 of article 6 of the Constitution of Texas? That sole question was certified to our Supreme Court by our Court of Civil Appeals for the First Supreme Judicial District.

Said section 2 of article 6 embodies what is known as the "suffrage clause" of our Constitution. Concededly, it restricts to "males" the privilege of voting in "any election" lying within its legal effect and operation. To that certified question this court answered in the negative—holding that said statute is not violative of said suffrage clause. The controlling principle was that a primary election or a primary convention accomplishes no "governmental" purpose, and, in contemplation of law, concerns only a select and voluntary group of persons, and consequently is not an "election" within the historical meaning, or the legal effect or operation, of said suffrage clause. In that decision Chief Justice PHILLIPS declined to concur, and filed a dissenting opinion.

That decision of this court, as reflected in the clear, yet brief, majority opinion by Mr. Associate Justice GREENWOOD, announces no new or strange doctrine. It presents no novel principle in the construction of Constitutions. Whether that decision be right or wrong, each and every principle upon which it rests is supported by an overwhelming weight of legal authority throughout the United States. That, at least, is a plain, stubborn, undeniable fact, which said dissenting opinion does not even question. See cases cited in said majority opinion.

Moreover, and of greater present importance, is the additional demonstrable fact that said decision of this court in this case is strongly supported, in principle, by four unanimous decisions of this court, rendered prior to the enactment in this state of any statute relating to woman suffrage. Graham v. City of Greenville, 67 Tex. 62, 2 S. W. 742; State v. Waxahachie, 81 Tex. 626, 17 S. W. 348; Waples v. Marrast, 108 Tex. 5, 184 S. W. 180, L. R. A. 1917A, 253; Beene v. Waples, 108 Tex. 140, 187 S. W. 191. In the first two cases this court held the provision of our Constitution, that "in all elections by the people, the vote 'shall be by ballot" (section 4, art. 6), inapplicable to the statutory "vote" on annexation of adjoining territory to a city (R. S. 1879, art. 503; R. S. 1911, art. 781). Each of the latter two cases involved the constitutionality of a primary election statute, and in each the inherent and

---

⬅➡For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

radical distinction existing between "primary elections" and "general elections" was clearly drawn and emphasized, and in each instance that distinction, involving a clear-cut *classification* by this court of "elections" of essentially different kinds, was treated as a sufficient basis, or test, for determining the constitutionality or unconstitutionality of a primary election statute. In both of those cases this court classified "elections" as being either "governmental," including "general elections," or nongovernmental, including "primary elections."

In Waples v. Marrast, supra, in 1916, in a clear and forcible opinion by the author of the dissenting opinion in the present case, this court declared, without a dissenting voice, that any primary election is, essentially, merely *advisory*, rather than *of final effect*, in that it does not determine, in contemplation of law, who shall fill any office, or whether any particular "governmental" policy shall or shall not prevail, but, on the contrary, is for only "party" purposes, affecting only some of the people, in contradistinction to "governmental" or "public" purposes, affecting all the people, and that, consequently, payment of expenses of a primary election out of public revenues derived from taxation is inhibited by that clause of our state Constitution which declares that "taxes shall be levied and collected * * * for *public purposes* only" (section 3, art. 8), and also by that clause thereof which denounces the use or "grant" of "public money * * * in aid of, or to, any individual, association or corporation whatsoever" (section 52, art.' 3)., Accordingly, *in that case*, and solely upon that ground, this court held the entire Presidential Primary Act of 1913 (Laws 1913, c. 46) unconstitutional and void.

Shortly afterward, during the same term, in Boene v. Waples, in an opinion prepared by this writer, this court expressly and plainly, and again without dissent, reaffirmed the doctrine or principle so declared and upheld in Waples v. Marrast, citing that case in its support, and declaring that if our senatorial primary election statute, then in question, "should be construed as meaning that the election officers referred to therein * * * are to be paid, for their services, out of public funds, such provision for payment * * * is, plainly, unconstitutional, as directing a misuse of public funds"; but that statute was given a different construction, saving it from the taint of such invalidity.

The gist of the principle, or doctrine, which those two former unanimous decisions of this court established in this state *as of controlling importance in determining the validity or invalidity of primary election statutes*, is, undeniably and simply, that, unlike general elections, primary elections are not for any truly "public" or "governmental" purpose, or, in the graphic language of our

Chief Justice, in Waples v. Marrast, "they perform no governmental function."

The present case is, therefore, the third case in which the hereinabove stated distinction between primary elections and governmental elections has been made, squarely and unmistakably, the basis of a decision of this court in passing upon the constitutionality of a primary election law; yet this is the first instance in which any member of this court has dissented from the full and logical application of the above-stated doctrine or principle to the facts of the case or question then before the court for decision, even though, in the first case, it resulted in striking down an act of the Legislature. However, in the first two cases, the right of women to vote in a primary election was not involved.

That selfsame doctrine, or principle, involving that selfsame *classification* of elections, which thus was so clearly enunciated, and so firmly fixed in the jurisprudence of Texas, by repeated decisions of this court, in which all members, including our present Chief Justice, heartily concurred—a doctrine or principle strongly upheld by so many of said cited decisions in other states—forms one of the two cornerstones upon which rests the decision of this court in the present case. The other cornerstone thereof is the proposition that, under our form of government, it is the duty of the courts to uphold as valid a legislative enactment, unless its unconstitutionality is clear and unquestionable. Said statute is not *clearly* unconstitutional. To that rule, although not to its application in this case, said dissenting opinion of our Chief Justice yields full assent, in saying, as it does with reference to our Legislature, "any doubt as to the validity of its legislation is to be resolved in its favor." As to the correctness of that rule, in testing validity of statutes, there is no difference of opinion whatever anywhere among the authorities.

[1] Except as restricted by the organic law of the land—the Constitution of the United States or the Constitution of the state—a Legislature has, of course, full power and authority to deal, as it may see fit, with the subject of suffrage in any election which may be required or authorized by law. That proposition is axiomatic. That much being true, the declaration of Chief Justice PHILLIPS, in his dissenting opinion in the present case, that said decision of this court therein "subverts the Constitution of this state and makes of it a vain and useless document," at once is seen to be of deep and broad significance. It not only challenges the correctness of that decision, but, in logical effect, it arraigns the general soundness of the principle enunciated by himself for this court in Waples v. Marrast, supra, and, by necessary implication, it includes also

within said quoted and far-reaching indictment numerous carefully matured and similar decisions of many learned and distinguished jurists of various other states, which uphold, as not repugnant to similar suffrage clauses, the power of their own Legislatures to prescribe different qualifications for voting in primary elections.

Can it, then, really be true that thus, through the passing years, the carefully considered and well-settled decisions of so many reputable courts of last resort in other states have done such destructive violence to the Constitutions of their own states, in construing a suffrage clause which, our Chief Justice asserts, "is so simple and plain as not to admit of construction or refinement by courts"? And in applying. to said limited woman's suffrage statute of 1918, as a test of its validity, the hereinabove stated doctrine, or principle, concerning *primary elections*, which formerly this court had enunciated as a test of statutory validity in Waples v. Marrast, and had reiterated in Beene v. Waples even prior to the enactment of that statute, did this court indeed err? If so, the situation is quite unusual, calling for a complete and prompt reversal of said decision in the present case, ere the ending of this term shall forever terminate this court's present unquestionable power and authority to take such action in this case.    •

Coming from their exalted source, the above-quoted declarations of our Chief Justice in said dissenting opinion—first, that said suffrage clause is "so simple and plain as not to admit of construction or refinement by the courts"; and, second, that said decision in the present case "subverts the Constitution of this state"—well may cause the other members of this court candidly and patiently to examine anew the foundations of their own faith in the soundness of their decision in this case, and, if said decision be found unsound, to reverse themselves, or, if it be found correct, to reiterate, in somewhat more extended form, and, if possible, to emphasize, the reasons which impel its affirmance.

Certainly this court should not permit any erroneous decision to stand; and where, as in this instance, the case involves a great constitutional question, upon which conflicting decisions have been rendered by Supreme Courts of different states, and upon which the Supreme Court of one state reversed its own earlier holding, and upon which, in several states, members of the same Supreme Court have written conflicting opinions, and upon which the members of even this court, after painstaking research and careful study of the question, have been unable to agree, it is of prime importance that this court's final decision of that question shall be unquestionably sound and correct.

Moreover, the motion and argument of the tax collector, Schneider, for a rehearing, prepared and filed in this court by his attorneys, and covering 59 printed pages, is entitled to this court's careful consideration.

But is said original decision of this court in this case, even though so thoroughly backed up and supported by so many decisions of other courts, and by various former decisions of this very court, nevertheless erroneous? Let us see.

. Do primary elections and primary conventions really lie within the historical meaning, and the legal effect and operation, of our said suffrage clause? That is the very heart of said certified question. The decision of this court in this case proceeded upon the view that the word "election," as used in said suffrage clause, is susceptible of more than one meaning, and is therefore open to construction by the courts. The declaration of said dissenting opinion is that the word "election," as there used, is "plain, simple, and unmistakable," "so simple and plain as not to admit of construction or refinement by courts." That is the precise point of divergence between those opinions:

At the outset it must be conceded, candidly, that to the definition of "electors" in the suffrage clause of a Constitution is applicable the maxim, "The mention of one is the exclusion of the other," and, because of that restrictive effect, the Legislature is powerless validly either to add to or to take from such constitutional qualifications of voters in any "election" really lying within the legal scope and operation of that suffrage clause. It follows that if, in answering said certified question, the full "rigor of the phraseology" of said suffrage clause is to be applied literally—if the word "election" in that clause was there used by our fathers in its broadest etymological significance; if it is as inelastic as cast iron; if it is, indeed, wholly "unambiguous," and, consequently, not open to "construction" by the Legislature and the courts—then the conclusion voiced in said dissenting opinion in this case is sound, and said statute of 1918 should be held unconstitutional and void. But upon no other theory or view whatsoever can that conclusion rationally be maintained. Here, then, we have the crux of the whole matter.

Whether "election," as used in such a suffrage clause, does or does not embrace "primary elections," has been frequently a mooted question. In most of the states where it has arisen, that question has been decided negatively; but in a few states it has been decided affirmatively. To say the least of it, history demonstrates that, upon that issue, there have been numerous irreconcilable conflicts between decisions of courts of other states, and, in certain instances, as in this case, between opinions of members of the same court. If the word "election,"

as used in such a suffrage clause, is not, indeed, ambiguous, why have so many trained jurists in other states disagreed as to its full meaning and legal effect and operation; many holding, as do a majority of this court, that it *does not*, and a few declaring, as does our dissenting member, that it *does*, include "primary elections"? Why this lawsuit? Why the case of Hamilton v. Davis, Tax Collector, 217 S. W. 431, from another portion of this state, which was decided here, on the same day as this present case? And why was said certified question in this case sent by a Court of Civil Appeals to the Supreme Court for answer? And why, after exhaustive research and very careful consideration of that very issue, have the majority and the minority of even the Supreme Court been unable to agree, even as to whether the word "election," as used in said suffrage clause, is or is not ambiguous—calling for "construction" by this court? What better or fairer, even though not conclusive, practical tests of ambiguity of language can be devised or applied? Upon the issue as to the true meaning and legal operation of that word, "election" as intended by such a suffrage clause, there certainly has existed, and, it seems, there still exists, a considerable difference of opinion among men whose carefully matured opinions on that very point are entitled to respectful consideration. The *ambiguity* of "election," as used in said suffrage clause, therefore, fairly and reasonably may be regarded and treated as definitely established.

[2] Reason and all the authorities agree that, where the language of a Constitution or of a statute is ambiguous, "construction" thereof becomes necessary. That much is conceded by said minority opinion. Black's Law Dictionary (2d Ed.) defines "construction" thus:

"The process, or the art, of determining the sense, real meaning, or proper explanation of obscure or ambiguous terms or provisions in a statute, written instrument, or oral agreement, or the application of such subject to the case in question, by reasoning in the light derived from extraneous connected circumstances or laws or writings bearing upon the same or a connected matter, or by seeking and applying the probable aim and purpose of the provision."

The decisions of our own Supreme Court, and of perhaps every appellate court in the United States, are replete with "constructions" of ambiguous provisions of state Constitutions. 4 Enc. Dig. Tex. Rpts. 388, note 1, and cases cited. Constitution of Texas, Annotated (Harris) pp. 52–901. The provision of section 3 of article 7 of our Constitution relating to the levy and collection, by school districts, of ad valorem taxes "for the further maintenance of public free schools, and the erection and equipment of school buildings therein," was construed by this court, and was held to include " 'sites,' the land on which to erect the buildings." The decision was unanimous, our present Chief Justice concurring. The opinion, by Chief Justice Brown, declared:

"The literal construction of the Constitution insisted upon would destroy the bonds heretofore issued by school districts and create confusion in the management of the public free schools. But we have no hesitancy in holding the granting of the authority to build schoolhouses implies the authority to acquire the land on which they are to be erected. Lewis' Sutherland Statutory Construction, vol. 2, §§ 502, 503, 504." Glass v. Pool, 106 Tex. 266, 166 S. W. 375.

Verily, "the letter killeth, but the spirit giveth life." 2 Cor. iii, 6. See, also, Aransas County v. Coleman-Fulton Pasture Co., 108 Tex. 216, 191 S. W. 553, wherein the word "roads," as used in subdivision (c) of section 52 of article 3 of our state Constitution, was *construed* by this court, and was held to apply to a certain roadway, including a reinforced concrete bridge more than 3,000 feet in length across an arm of the sea. In that case this court said, through Chief Justice Phillips:

"Concretely, therefore, the question for decision is the sense in which the term 'roads' is used in section 52 of article 3 of the Constitution. * * * In different provisions of the Constitution, namely, section 56 of article 3, section 9 of article 8, section 2 of article 11, and section 24 of article 16, roads and bridges are dealt with as distinct subjects. In section 9 of article 8, the construction of each is recognized as a distinct purpose of taxation. Inasmuch as the term 'roads' is very plainly used in these sections in a specific sense, it is urged by the defendants in error that the same restricted meaning should be given it in the construction of section 52 of article 3. Such was the view of the Court of Civil Appeals. There is force in the position as a general rule of construction. But the sense in which a term is used in other provisions of a Constitution is not a conclusive test of its meaning in a particular provision. The spirit, purpose and scope of the particular provision are all to be consulted in the effort to determine with certainty the meaning of its terms."

If the word "roads," as used in our Constitution is, indeed, thus subject to "construction," and even entitled to *varying meanings*, according to the context, may not the word "election," as used in that same instrument, although a word in general use by the plain people, be subject, likewise, to "construction" by courts, in ascertaining and carrying out the purpose of those who made our Constitution, thereby in the present case also, leaving the Legislature without unwarranted restrictions in the exercise of its broad law-making powers? See, also, Cox v. Robison, 105 Tex. 426, 150 S. W. 1149, the opinion being by our present Chief Justice. Therein this court *construed, in the light of history,* the words "releases" and "owner," as used in the decla-

ration of our Constitution that "the state of Texas hereby releases to the owner or owners of the soil all mines and minerals that may be on the same, subject to taxation as other property." Section 7, art. 14. The history of the matter was held to require that said provision of the Constitution be construed as operating retrospectively only, and not prospectively. No fine distinction between the "construction" and the "exposition" of Constitutions was drawn.

Such hereinabove mentioned ambiguity in the meaning and legal effect of the word "election" in our said suffrage clause existing, it is, undeniably, not only the proper function, but the duty, of this court, in answering said certified question, properly to construe that quoted word before testing thereby the validity of said legislative enactment of 1918 relating to restricted woman suffrage. In construing said word "election," as it stands in said suffrage clause—in ascertaining its true and full legal operation and effect—certain long-established and generally accepted canons of constitutional construction are applicable, and must prevail. The result which logically must follow is one for which neither this court nor its members are in any sense responsible.

[3] Due consideration and weight (although not necessarily conclusive force) should be given by the courts to a construction placed by the Legislature upon the state Constitution. Chambers v. Fisk, 22 Tex. 504; Willis v. Owen, 43 Tex. 41; Holmes v. State, 44 Tex. 631; Cook v. Brown, 45 Tex. 73; Ft. Worth v. Davis, 57 Tex. 225; Robertson v. Breedlove, 61 Tex. 316; Barker v. Torrey, 69 Tex. 7, 4 S. W. 646; Railway v. State, 77 Tex. 367, 12 S. W. 988, 13 S. W. 619; State v. McAlister, 88 Tex. 284, 31 S. W. 187, 28 L. R. A. 523; Bahn v. Starcke, 89 Tex. 203, 34 S. W. 103, 59 Am. St. Rep. 40; Brown v. Galveston, 97 Tex. 1, 75 S. W. 488; Cox v. Robison, 105 Tex. 426, 150 S. W. 1149; Bowser v. Williams, 6 Tex. Civ. App. 197, 25 S. W. 453; Hovey v. State, 119 Ind. 386, 21 N. E. 890.

"Great deference is due to a legislative exposition of a constitutional provision." Sedg. on Stat. and Const. Law, p. 412, and cases cited.

"In case of doubtful interpretation, a long-settled and well-recognized judicial interpretation, or even legislative or executive construction within the sphere of their respective functions, might be sufficient to turn the balanced scale." Willis v. Owen, supra.

"The rule is that a law will not be declared unconstitutional unless it is clearly so, and in cases of doubt it will be held valid. The opinion of the Legislature of its constitutional power is entitled to great weight." Barker v. Torrey, supra.

In discussing the effect which courts should give to a construction placed by the law-making department upon an ambiguous provision of a state Constitution, the Supreme Court of Indiana, through Elliott, C. J., said in Hovey v. State, supra:

"As there is some warrant in the Constitution for the claim of the legislative right to appoint the governing officers of the benevolent institutions, it is our duty to ascertain what practical exposition has been given to the Constitution, and if we find a principle established by long-continued practice, we must yield to it, unless we are satisfied that it is repugnant to the plain words of the Constitution. We are far from asserting that the plain provisions of the Constitution may be broken down or over-leaped by practical exposition, but what we do assert is that where, as here, there are provisions not entirely clear and free from doubt, practical exposition is of controlling force. Our own and other courts have time and time again adjudged that practical exposition is of controlling influence wherever there is need of interpretation. The language employed by the courts is strong, and the current of opinion is unbroken. * * * But it is unnecessary to quote the expressions of the courts, for harmony reigns throughout the whole scope of judicial opinion upon this subject. Board, etc., v. Bunting, 111 Ind. 143; Weaver v. Templin, 113 Ind. 298, 301; Stuart v. Laird, 1 Cranch, 299; Martin v. Hunter, 1 Wheat. 304; Cohens v. Virginia, 6 Wheat. 264; Ogden v. Saunders, 12 Wheat. 213, 290; Minor v. Happersett, 21 Wall. 162; State v. Parkinson, 5 Nev. 15; Pike v. Megoun, 44 Mo. 491; People v. Board, etc., 100 Ill. 495; State v. French, 2 Pinney (Wis.) 181."

[4] A kindred rule is that, where a statute is ambiguous—open to construction—a construction given it by even the head of an executive department of the state government will be followed and upheld by the courts, unless such construction is clearly erroneous. Hancock v. McKinney, 7 Tex. 384; Johnston v. Smith, 21 Tex. 722; Dean v. State, 54 Tex. 315; Smith v. McGaughey, 87 Tex. 61, 26 S. W. 1073; Railway v. State, 95 Tex. 507, 68 S. W. 777; McGee v. Corbin, 96 Tex. 35, 70 S. W. 79; Tolleson v. Rogan, 96 Tex. 424, 73 S. W. 520; State v. Timme, 54 Wis. 340, 11 N. W. 785. Judge Cooley, in his great work on Constitutional Limitations (6th Ed.) p. 83, said:

"Great deference has been paid in all cases to the action of the executive department, where its officers have been called upon, under the responsibilities of their official oaths, to inaugurate a new system, and where it is to be presumed they have carefully and conscientiously weighed all considerations, and endeavored to keep within the letter and the spirit of the Constitution. If the question involved is really one of doubt, the force of their judgment, especially in view of the injurious consequences that may result from disregarding it, is fairly entitled to turn the scale in the judicial mind."

In Tolleson v. Rogan, supra, it was said:

"While, as this court has frequently held, actions of such officers in plain opposition to law cannot be upheld, it is equally true they are entitled to great weight in determining the true construction of doubtful and indefinite regulations made for their guidance."

In State v. Gunter, 36 Tex. Civ. App. 381, 81 S. W. 1028, the trial court and the Court

of Civil Appeals each held that a certain stat-ute and a later act amending it were involved in such uncertainty on the point presented as to impel the courts to adopt and follow the construction given to said statutes by the Attorney General and by the Commissioner of the General Land Office. A writ of error was refused by this court.

Both of the hereinabove stated rules on construction involve recognition of respect due to co-ordinate departments of government. Everywhere they are regarded as sound, and such constructions, unless clearly unsound, are regarded as being of persuasive force.

Already, and aside from the decision of this court in this case, said suffrage clause has been treated as *open to construction*, and has been *construed*, in several instances, by others, who also were under a solemn oath of office faithfully to discharge and perform their duties according to the best of their skill and ability, "agreeably to the Constitution * * * of this state." Const. Tex. art. 16, § 1.

In the first instance the Legislature construed said suffrage clause as *not prohibiting* the valid enactment of said statute of 1918, which undertook, for the first time in Texas, to confer upon *women* the privilege of participating in *party councils*. That legislative action obviously was based upon the belief that the word "election," as used in said suffrage clause, does not, in legal effect, include primary elections and primary conventions. Railway v. State, 77 Tex. 367, 12 S. W. 988, 13 S. W. 619; Railroad Commission v. Railway, 90 Tex. 340, 38 S. W. 750; Brown v. City of Galveston, 97 Tex. 1, 75 S. W. 488; Ashford v. Goodwin, 103 Tex. 491, 131 S. W. 535, Ann. Cas. 1915A, 699; Lewis' Sutherland on Stat. Const. § 82.

"Each legislator is required to take the official oath prescribed by the Constitution, which pledges him to discharge his duty in conformity with that instrument. The enactment by the Legislature of the charter of Galveston involved the consideration by each member of both houses and the Governor of the question now before us; that is, each must have determined that the bill did not violate the Constitution of the state of Texas in 'any particular." Brown v. City of Galveston, supra.

[5] Enactment of said limited woman's suffrage statute of 1918 amounted, necessarily, to a legislative *classification* of "elections" into two classes, to wit: First, elections to which said suffrage clause *does* apply, such as "general elections," in which, of course, only "males" may be permitted to vote; and, second, elections to which said suffrage clause *does not* apply, such as "primary elections" and "primary conventions." Thus, while distinctly recognizing that, as related to elections of said first class, said suffrage clause is, indeed, *restrictive* in meaning and in legal ef-fect, denying to the law-making department power or authority validly to pass any statute authorizing *women* to vote in elections of *that class*, the Legislature, in enacting said statute of 1918, deliberately and solemnly asserted its belief that such restrictive effect of said suffrage clause does not extend to or embrace elections of said *other class*—including primary elections and primary conventions—and that, as a necessary consequence, the Legislature was free, under the Constitution and in the exercise of its general legislative powers, validly to enact said statute of 1918, conferring upon women the privilege of voting in elections of the *latter class*. Its general legislative power is not restricted, except by the Constitution of the United States and the Constitution of this state. Brown v. Galveston, 97 Tex. 1, 75 S. W. 488; Lytle v. Halff, 75 Tex. 128, 12 S. W. 610; Harris Co. v. Stewart, 91 Tex. 143, 41 S. W. 650; Cooley, Const. Lim. 200, 201.

[6] Courts must assume that in enacting a statute the Legislature was familiar with previous decisions of the Supreme Court affecting the subject-matter. Wright v. Tipton, 92 Tex. 168, 46 S. W. 629. It seems clear that, in 1918, in the enactment of that statute relating to primary elections, the Legislature undertook to profit by experience, and to avoid the mistake into which it had fallen in 1913 in the enactment of the hereinabove mentioned presidential primary election statute, which meanwhile, in 1916, had been held void by said decision of this court in Waples v. Marrast. That former legislative error consisted, in 1913, solely and simply in classifying primary elections in the same class with "general elections" and other "*governmental*" elections, and, as a consequence, in undertaking to authorize payment of primary election expenses out of public revenues. That was the very thing that this court, in Waples v. Marrast, and again in Beene v. Waples (both prior to 1918), expressly had declared violative of section 3 of article 8 and also of section 52 of article 3 of our Constitution, although, in each of those unanimous opinions, the authority of the Legislature to authorize payment of expenses of elections of *a different* class, embracing "general elections," out of such funds, was recognized and expressly declared. Accordingly, in making the classification of elections which, as hereinabove shown, the enactment of said statute of 1918 necessarily involved, the Legislature evidently undertook intelligently and faithfully to observe, and certainly did follow, strictly, the precise lines of demarcation *in classification of elections* which the judicial department of the government, in those two earlier cases, distinctly had marked out and defined, and had applied, as a test of validity of the two primary election statutes of 1913 which, respectively, were involved in those cases.

Said evident and successful attempt of the

Legislature in 1918 to adopt and follow said antecedent judicial classification of "elections," as a test of the constitutionality of primary election statutes, is a fact worthy of note in tracing the history of primary election statutes in Texas. Why should that triply affirmed classification of elections be now repudiated?

Said statute of 1918, House Bill No. 105, passed the House of Representatives by a vote of "yeas 84, nays 34." It passed the Senate by a vote of "yeas 18, nays 5, 4 pairs." That means, necessarily, that 102 members of the Legislature considered H. B. 105 not repugnant to said suffrage clause (section 2, art. 6), or to any portion of our state Constitution, but in all respects valid. The opposing votes did not necessarily question its constitutionality; but, if they be construed as so doing, it means no more than that 47 members of the Legislature represented in the voting considered the bill violative of *some* provision of our organic law—probably of said suffrage clause. The net result, upon even that theory of the vote, would be that more than two-thirds of the stated aggregate number, by their recorded votes, solemnly affirmed the entire constitutionality of the measure, and less than one-third questioned it; their recorded vote tending, at most, *to raise a doubt* concerning the validity of that measure.

Moreover, instead of vetoing said H. B. 105 as being obnoxious to said suffrage clause, or permitting that bill to become a law without his signature, the Governor indorsed upon it his affirmative approval, thereby, in legal effect, declaring his belief in the entire constitutionality of that measure.

In the second instance, said legislative construction of said suffrage clause received high judicial sanction. In Hamilton v. Davis, the district court of McLennan county, Fifty-Fourth judicial district, a constitutional court of general original jurisdiction, sustained a general demurrer to a petition which sought an injunction to restrain the tax collector of that county from issuing a poll tax receipt to any woman pursuant to said statute of 1918. As grounds for such relief that petition expressly alleged that said statute was repugnant to said suffrage clause (section 2 of article 6), and to several other therein particularly mentioned sections of our Constitution. A general demurrer to said petition was sustained by the district court, upon a ground or grounds not disclosed by the record in that case. However, upon appeal therein, that judgment, refusing an injunction, was affirmed by our Court of Civil Appeals for the Third Supreme Judicial District, upon the ground that said statute of 1918 (here under attack) is constitutional and valid, as well as upon the ground that, in any event, the petitioner had an adequate remedy at law in the form of a contest of the election. Hamilton v. Davis, 217 S. W. 431. Under our judicial system that high court is clothed with broad

appellate jurisdiction, much of which is final. That court declared:

"It is the contention of appellant that 'election,' as that term is used in section 2, art. 6, of the Constitution of this state, in which the qualifications of voters at 'an election' are stated, includes primary elections. With this we do not agree"—citing and quoting from Waples v. Marrast, supra, and numerous cases from other states.

But not all of the directly pertinent Texas judicial decisions down to the appearance of the present case in this court are in harmony. In this very case the district court of Fayette county, Twenty-Second judicial district, another constitutional court of general original jurisdiction, sustained a general demurrer to the petition of plaintiff, praying for a writ of mandamus to compel the tax collector of Austin county to issue to her a tax receipt, pursuant to said statute of 1918, the ground of that decision being, it appears, that said statute was "unconstitutional and void." That decision of the district court in this case conflicts, squarely, with said subsequently rendered decision of said Court of Civil Appeals for the Third District, in Hamilton v. Davis. That very conflict suggests a grave doubt, at least, as to whether said statute of 1918 is valid or invalid. Evidently it was because of that doubt that, instead of deciding that question, the Court of Civil Appeals for the First District certified it to this court for answer. Thus it appears that before this case reached this court the constitutionality of said statute had been solemnly affirmed by 102 members of the Legislature, and by the Governor, and by the unanimous decision of a Court of Civil Appeals consisting of three members, totaling 106 state officers, besides the Attorney General, who appeared in Hamilton v. Davis- and in the present case in support of said statute. Moreover, most of the county tax collectors all over the state have observed and enforced it as being valid.

Under such circumstances, involving upon one hand the decision of one district court holding said statute of 1918 invalid, and the certificate of one Court of Civil Appeals implying, although not expressing, doubt upon that point, and, upon the other hand, the conflicting construction so given to said suffrage clause by 102 legislators and the Governor, and the Attorney General, and by another Court of Civil Appeals, and in view of said two unanimous and comparatively recent supporting decisions of this court in Waples v. Marrast and in Beene v. Waples, and the numerous hereinabove mentioned antecedent decisions of Supreme Courts of other states holding, squarely, that such suffrage clauses are not applicable to primary elections, the majority of this court do not believe, and are unwilling to hold, that said Texas statute of 1918 is *clearly* repugnant to our said suffrage clause, section 2, art. 6. It follows that

said certified question must be answered negatively.

[7] That the courts should uphold a statute as valid, unless it is clearly unconstitutional, is well settled by the authorities everywhere, and is expressly conceded by said dissenting opinion in this case. The settled and oft-repeated decisions of this court, rendered prior to the enactment of said statute of 1918, are very clearly to this effect: Every intendment and presumption being in favor of the constitutionality of, a statute, it should not be held invalid unless its unconstitutionality be made to appear *beyond any reasonable doubt.* Sutherland v. De Leon, 1 Tex. 250, 46 Am. Dec. 100; Orr v. Rhine, 45 Tex. 345; Brown v. Galveston, 97 Tex. 1, 75 S. W. 488; Ashford v. Goodwin, 103 Tex. 491, 131 S. W. 535, Ann. Cas. 1915A, 699; Railway v. Griffin, 106 Tex..477, 171 S. W. 703, L. R. A. 1917B, 1108; Glass v. Pool, 106 Tex. 266, 166 S. W. 375; White v. White, 108 Tex. 570, 196 S. W. 508, L. R. A. 1918A, 339. To the same effect are Powell v. Pennsylvania, 127 U. S. 684, 8 Sup. Ct. 995, 32 L. Ed. 253; Labauve v. Michel, 121 La. 374, 46 South. 430; Beall v. Beall, 8 Ga. 210; Parkham v. Justices, 9 Ga. 341; Hanna v. Young, 84 Md. 179, 35 Atl. 674, 34 L. R. A. 55, 57 Am. St. Rep. 396; Kelso v. Cook, 184 Ind. 173, 110 N. E. 987, Ann. Cas. 1918E, 68; Morrow v. Wipf, 22 S. D. 146, 115 N. W. 1121; People v. Wright, 6 Colo. 92; Mayor v. Shattuck, 19 Colo. 104, 34 Pac. 947, 41 Am. St. Rep. 208; Miami County v. Dayton, 92 Ohio, 215, 110 N. E. 726; De Walt v. Bartley, 146 Pa. 529, 24 Atl. 185, 15 L. R. A. 771, 28 Am. St. Rep. 814, 9 R. C. L. 1025, § 42, and note 2; Black, Const. L. p. 61.

"It has been said by an eminent jurist that, when courts are called on to pronounce the invalidity of an act of the Legislature, passed with all the forms and ceremonies requisite to give it the force of law, they will approach the question with great caution, examine it in every possible aspect, and ponder upon it as tong as deliberation and patient attention can throw any new light upon the subject, and never declare a statute void, unless the nullity and invalidity of the act are placed, in their judgment, beyond reasonable doubt. A reasonable doubt must be solved in favor of the legislative action, and the act be sustained." Cooley's Constitutional Limitations (6th Ed.) p. 216.

In Powell v. Pennsylvania, supra, the Supreme Court of the United States declared:

"Every possible presumption * * * is in favor of the validity of a statute, and this continues until the contrary is shown beyond a rational doubt."

In Ashford v. Goodwin, supra, upon which said dissenting opinion in this case places great reliance, this court, through Judge Brown, said:

"When the Legislature passed that act they must, in the discharge of their duty, have de-termined that the power to so enact was conferred upon that body by the language we have quoted above from section 8 of article 5 of the Constitution as amended. The Legislature having determined that the power was granted to that body to pass the law, this court must sustain it, unless its invalidity be apparent beyond a reasonable doubt."

That declaration formed the main basis of this court's decision in that case.

"We know of no rule of Law that would authorize us to say that an act of the Legislature is unconstitutional unless it be clearly so." Sutherland v. De Leon, supra.

"The act should be upheld by the courts unless it is clearly unconstitutional." White v. White, supra.

Again this court said:

"If the statute is not manifestly in conflict with some provision of the Constitution, then we must sustain and construe it as we find it expressed. * * * 'Statutes cannot be declared invalid on the ground that they are unwise, unjust, unreasonable, or immoral, or because opposed to public policy or the spirit of the Constitution. Unless a statute violates some express provision of the Constitution, it must be held to be valid.' Lewis' Sutherland Statutory Construction, vol. 1, § 85. The law in this respect has not been shown to be in conflict with the Constitution in any particular; therefore no court in this state has power to right that wrong, if it be such." Glass v. Pool, supra.

In Railway v. Griffin, supra, this court said:

"If, by reasonably fair construction it appears that the Legislature was empowered to enact the law, this court will recognize it as valid—that is, a serious doubt of the power must be resolved in favor of the validity of the law."

In support of that proposition this court there quoted as follows from Lewis' Sutherland on Statutory Construction, § 82:

"Every presumption is in favor of the validity of an act of the Legislature, and all doubts are resolved in support of the act. 'In determining the constitutionality of an act of the Legislature, courts always presume in the first place that the act is constitutional. They also presume that the Legislature acted with integrity, and with an honest purpose to keep within the restrictions and limitations laid down by the Constitution. The Legislature is a co-ordinate department of the government, invested with high and responsible duties, and it must be presumed that it has considered and discussed the constitutionality of all measures passed by it.' The unconstitutionality must be clear or the act will be sustained."

Our Court of Criminal Appeals, in an opinion by Judge Ramsey, declared:

"The rule is universal that the courts will not declare an act of the Legislature unconstitutional unless such infirmity and vice clearly appears." Solon v. State, 54 Tex. Cr. R. 262, 114 S. W. 349.

[8-10] But, as hereinabove indicated, and as succinctly yet clearly and strongly set forth in said majority opinion in the present case, there, is another, and separate, and largely independent, and entirely sufficient and satisfactory reason which impels the same negative reply to said certified question. It is a reason which goes to the merits of that question, leaving wholly out of consideration, for the time, any and all weight and importance which has been given hereinabove to the stated legislative construction of our said suffrage clause as not prohibiting the enactment of said statute of 1918.

Upon the merits, then, the question recurs: Are primary elections and primary conventions "elections" within the historical and generally accepted meaning, and the legal effect and operation, of said restrictive provisions of our said suffrage clause, section 2 of article 6? By what standards or tests should that question be answered, unless it be by those which generally have been applied, with controlling force, by the best law writers and by practically all Supreme Courts throughout the United States, including Texas?

Already, the word "election," as employed in said suffrage clause, has been shown hereinabove to be ambiguous, necessitating in this case construction by the courts. The primary purpose of all construction of language is to try out its intendment—to ascertain its true meaning in the context. So, in construing a statute, the purpose is to ascertain the legislative intent, which is ascertainable from the language employed as tending to accomplish the legislative design and purpose. When that language has a well-settled meaning and legal significance, it is presumed to have been used in that sense. Thus, when our Legislature brings over from a sister state, and adopts, in identical or substantially similar terms, a statute which has received a settled construction from the courts of the state from which it was so borrowed, the courts of this state customarily apply to it the same construction which it had received in the sister state. That is done in recognition of a generally accepted rule of construction, and upon the presumption and belief that the Legislature expected and desired that such rule of construction would be applied by the courts in ascertaining and declaring, and in enforcing, the true legislative intent and purpose. What better test could there be? That rule of statutory construction has prevailed in Texas, and elsewhere, since long prior to the enactment by our Legislature of said restricted woman's suffrage statute in 1918. De Cordova v. Galveston, 4 Tex. 470; Munson v. Hallowell, 26 Tex. 481, 84 Am. Dec. 582; City of Tyler v. Railway, 99 Tex. 497, 91 S. W. 1, 13 Ann. Cas. 911; Green v. G. U. O. of Odd Fellows, 106 Tex. 225, 163 S. W. 1071; McDonald v.

Hovey, 110 U. S. 619, 4 S. Ct. 142, 28 L. Ed. 269; Black on Interpretation of Laws, p. 381, and cases cited.

In De Cordova v. Galveston, supra, this court, through Chief Justice Hemphill, did not hesitate to say:

"In attempting to ascertain the intent of the prohibition, we can derive material assistance from the examination of the Constitutions of other states, in which similar restrictions are to be found, and from the decisions of the enlightened tribunals by which such provisions have been considered and expounded."

In Munson v. Hallowell, supra, it was said by this court:

"It cannot be doubted that when a statute, which has been borrowed by us from England or some of the older American states, has, previous to our enactment of it, received a settled and uniform construction by the courts of the country from which we have taken it, our courts will give to it a similar construction. * * * Whether the construction here indicated is the one we should place upon the statute, if it were a question of first impression, unaffected by previous judicial opinion, is not now necessary to be determined. Its construction has been settled by a long series of decisions reaching back in England and America to the time of its enactment. If under these circumstances we were to give it a different interpretation from that which it has heretofore uniformly received, we think we should with much more propriety be subject to the charge of judicial legislation than when we give it the construction which has heretofore almost invariably been given to it, *although its mere letter might lead to a different conclusion.*"

In City of Tyler v. Railway, supra, this court said:

"It is the settled rule of construction in England that a contract, which by its terms is capable of being performed within one year from the date of its making by one party, and which has been fully performed by such party within the year, is not within their statute of frauds, which is in the same language as ours. * * * The English construction of that clause of the statute of frauds * * * is followed by the courts of the following states: Alabama, Georgia, Illinois, Indiana, Iowa, Kansas, Kentucky, Maine, Maryland, Minnesota, Missouri, Nebraska, New Hampshire, New Jersey, Rhode Island, South Carolina, Texas, Virginia, and Wisconsin. * * * Donellan v. Read, which first construed the statute of frauds of that country, was decided in 1832, and in 1840 the Congress of the Republic of Texas embodied the same language that was construed in that case in the statute of frauds enacted by that Congress on the 16th day of March, 1840. So closely did the Congress follow the English statute that the conclusion is irresistible that the Texas statute was in fact copied from that of England. Hart. Dig. 1451. It is fair to presume that the members of the Congress which enacted that law were advised of the construction which the courts of England had placed upon the language they then embodied in the statute of frauds of the Republic; and

we may also presume that the legislators used these words with the intent that they should receive the same construction that had been placed upon them by the English court. Moffett v. Moffett, 67 Texas, 642; Johnson v. Hanscom, 90 Texas, 321; Morgan v. Davenport, 60 Texas, 234; Munson v. Hallowell, 26 Texas, 475; Snoddy v. Cage, 5 Texas, 106; Trigg v. State, 49 Texas, 645; Brothers v. Mundell, 60 Texas, 240."

[11] That same rule of construction is applicable, for like reasons, to the construction of Constitutions. Mellinger v. Houston, 68 Tex. 37, 3 S. W. 249; Robertson v. State, 63 Tex. Cr. R. 216, 142 S. W. 533, Ann. Cas. 1913C, 440; Brown v. Walker, 161 U. S. 591, 16 S. Ct. 644, 40 L. Ed. 819; State v. Blaisdell, 18 N. D. 31, 119 N. W. 360; Black on Interpretation of Laws, rule 21, p. 32.

In construing that portion of section 10 of article 1 (Bill of Rights) of our state Constitution which declares that in all criminal prosecutions the accused "shall be confronted with the witnesses against him," our Court of Criminal Appeals, which is our court of last resort in criminal cases, traced the history of that clause, and said:

"So, when Texas adopted this clause, it was no announcement of a new right to a person accused of crime, but was simply a preservation of a right that was a part of the law of England, of this Union, and of almost every state therein, and in arriving at a proper construction thereof, and to give the language its proper meaning, we must look to the decisions of England, of the United States, and the courts of the different states in the Union, for of such of them as were in existence at the birth of the Texas Republic they had long had this principle embodied in their system of government, and it is a well-known rule of law that, when we adopt a phrase or borrow a provision from the Constitution or laws of another state or country, we adopt that clause with the construction placed thereon by the courts of that state or country." Robertson v. State, supra.

In construing the suffrage clause of the Constitution of North Dakota the Supreme Court of that state said:

"Courts, in construing constitutional or statutory provisions which have been taken from another state, almost invariably hold that the Legislature or the Constitution makers are presumed to have adopted it with knowledge of the construction or interpretation given it by the courts of the state whence it comes, and therefore to have adopted such construction or interpretation. 2 Lewis, Suth. Stat. Const. 404; White v. Chicago, etc., Ry. Co., 5 Dak. 508, 41 N. W. 730; Sanford v. Duluth & D. Elevator Co., 2 N. D. 6, 48 N. W. 434; Jasper v. Hazen, 4 N. D. 1, 58 N. W. 454, 23 L. R. A. 58; Cass County v. Imp. Co., 7 N. D. 528, 75 N. W. 775; Oswald v. Moran, 8 N. D. 114, 77 N. W. 281; Bank v. Gutterson, 15 S. D. 486, 90 N. W. 144." State v. Blaisdell, 18 N. D. 31, 119 N. W. 360.

"It is an established rule of construction that whenever, in framing a Constitution, provisions from the Constitutions of other states are adopted, the judicial constructions of all such provisions from the other states are presumed to have been also adopted." 8 Cyc. 739, citing cases.

"When provisions have been adopted into the Constitution of the state, which are identical with or similar to those of other states, it will be presumed that the framers of such Constitution were conversant with, and designed to adopt also, any construction previously placed on such provisions in such other states." 12 Corpus Juris, p. 717, citing cases from 22 states.

[12] Similarly, although with less compelling force, when a suffrage clause is imported, literally or substantially, into a state Constitution from the Constitutions of other states, even prior to constructions thereof by the courts of the states whence it comes, subsequent constructions thereof by the courts of the states from which such clause was imported are strongly persuasive of the sense in which such clause was incorporated into the organic law of the adopting state. Thus in Mellinger v. Houston, supra, this court, through Mr. Justice Stayton, said:

"The section of the Constitution which declares that 'no citizen of this state shall be deprived of life, liberty, property, privileges or immunities, or in any manner disfranchised, except by the due course of the law of the land,' is written in plain language, but had not been so fully construed, as to its operation on laws retroactive in character, when the Constitution was adopted, as has it since been by the decision of the Supreme Court of the United States, to which we have referred; but it must be held that the people intended, by that clause of the Constitution, in so far as it is identical with the Fourteenth Amendment, to place thereby just such restrictions on the powers of the Legislature as the highest court in the nation has declared is the true construction of like language made a part of the Constitution of the United States for the purpose of placing a limitation on the power of the Legislatures of the several states."

Similarly significant, in the phraseology of a suffrage clause, is the use (as in section 2, art. 6, of our own Constitution) of the words "an election" and "any election," without addition thereto of such words as "which is now or hereafter may be authorized by law," which additional words, and words of more or less similar effect, were in the suffrage clauses of various states when our Constitution was adopted. In several such states such additional words have been held greatly to enlarge the field in which their suffrage clauses were designed to operate, extending their legal effect to include *all statutory elections*, as well as elections expressly required or plainly contemplated by the Constitution itself.

Almost every clause in a state Constitution has a fixed significance—a historic meaning—in the light of which it must be con-

strued and applied. So it is with our suffrage clause.

In construing the hereinabove quoted provision of section 7 of article 14 of our Constitution, concerning mines and minerals, this court, in an opinion prepared by the author of the dissenting opinion in the present case, said in 1912:

"Its terms must be considered as of such dignity, and be given all the effect that their nature imposes. But its effect is controlled by the intent that lay behind it on the part of the people who wrote it into the present Constitution. * * * It is a rule of universal observance in the construction of constitutions that it will be presumed that the language used was carefully selected. Mellinger v. City of Houston, 68 Tex. 44. And we are at liberty to extend that presumption to the use of the language of this provision."

And therein two ordinary words of said section 7, "releases" and "owner," were treated as requiring "construction" by the court, and were construed in the light of their antecedent and historic use and meaning in that context. Cox v. Robison, 105 Tex. 426, 150 S. W. 1149.

[13] Whether a particular statute does or does not conserve a wise public policy is a question in which courts are not concerned. That is a realm in which, in the absence of inhibition in the organic law of the land, the law-making department of our state government is supreme. Napier v. Hodges, 31 Tex. 287; English v. State, 35 Tex. 473, 14 Am. Rep. 374; Treasurer v. Wygall, 46 Tex. 447.

A primary election, being merely a method or device for selecting candidates to be voted for later by qualified electors of no party and of all parties, is not an "election" within the common-law definition of that word; primary elections being unknown to the common law. State v. Woodruff, 68 N. J. Law, 89, 52 Atl. 294; State v. Swanger, 212 Mo. 472, 111 S. W. 7.

As between statutes affecting private rights and statutes involving political matters only, courts usually are more liberal in upholding the constitutionality of statutes of the latter class. State v. Michel, 121 La. 374, 46 South. 430.

The list of cases cited in the majority opinion in this case, and herein, respectively, on the merits of the present issue, embraces two lines of decisions dealing with legislative authority over the elective franchise as related to restrictive suffrage provisions of state Constitutions. Some of those decisions did not, and some of them did, involve primary election statutes; yet all of them involved a construction of the word "election" in a suffrage clause. A number of those decisions expressly upheld the power of the Legislature to extend to women the privilege of limited suffrage—the right to vote in only *certain designated classes of elections*—even though the state Constitution contained a suffrage clause identical with, or substantially similar to, said suffrage clause of the Constitution of Texas. Among them were elections for various purposes not expressly provided for by the Constitution of that particular state, and not fairly in contemplation thereof, but authorized by *statute only*, to select, *finally, a purely statutory public officer*, or to determine, finally, some *purely statutory* and strictly *governmental* policy.

Of still closer applicability to the present case are quite a number of said cited decisions, which uphold, expressly and specifically, the validity of various *primary election statutes*, upon the view, and for the declared reason, that "primary elections" are not "elections" in contemplation of suffrage clauses such as ours.

Both of those extended lines of decisions enunciate the principle, or doctrine, that the particular class or character of election then before those courts, respectively, was not within the scope or meaning, or legal operation, of such a suffrage clause of a state Constitution. In that respect the controlling principle in each is common to both lines of decisions and also to the present case. Logically the legal effect of the great number and weight of the adjudicated cases is to leave the authority of the Legislature over party primaries untrammeled by the suffrage clause of our social compact.

Elsewhere than in Texas, "election," as used in various statutes, has been treated, generally, as "open to construction," and has been variously construed by courts of many states. Primary elections have been held not to be "elections," within the meaning of various *statutes* relating to "elections," as follows:

(a) Against betting "upon any election." Lillard v. Mitchell (Tenn. Ch. App.) 37 S. W. 702; Com. v. Helm, 9 Ky. Law Rep. 532; Dooley v. Jackson, 104 Mo. App. 21, 78 S. W. 330. In Dooley v. Jackson, a Missouri statute declared that bets on any "election authorized by the Constitution and laws of the state" are gaming; and another statute of that state authorized the maintenance of actions to recover money bet thereon. Held, said statutory provisions were limited to constitutional elections for the selection of persons to a public office, and did not apply to primary elections for the selection of candidates. The court said:

"We think it is clear that the word 'election,' as used in the statute, is used in its political sense, and in the same sense in which it is used in the Constitution, and means an election for public office, and does not include a primary election for the purpose of nominating a candidate for public office, and also that a primary election is not an election authorized by the Constitution."

(b) Against giving bribes to influence the result of an election. Kelso v. Cook, 184 Ind, 173, 110 N. E. 987, Ann. Cas. 1918E, 68; People v. Cavanaugh, 112 Cal. 674, 44 Pac. 1057. See Leonard v. Commonwealth, 112 Pa. 607, 4 Atl. 220, discussed hereinafter.

(c) Against fraud in conducting elections. State v. Woodruff, 68 N. J. Law, 89, 52 Atl. 294.

(d) Authorizing the use of voting machines at all elections. Line v. Board, 154 Mich. 329, 117 N. W. 730, 18 L. R. A. (N. S.) 412, 16 Ann. Cas. 248. In that case the Supreme Court said:

"A primary election is not an election to public office. It is merely the selection of candidates for office by the members of a political party in a manner having the form of an election. * * * The elections referred to are the elections where persons are given public offices by a plurality of the votes of all the electors voting thereat."

Under a Constitution defining qualified "electors" as male persons, but declaring women "competent to vote for all school officers and upon all questions pertaining solely to school matters," and a statute (which was in force prior to the adoption of the section of the Constitution which gave to women such restricted right of suffrage) requiring registration of "all persons qualified to vote at the ensuing election" and "of all qualified electors," the Supreme Court of North Dakota held that women were not "electors" within contemplation of said Constitution, and were not within the operation of said registration statute, and hence were entitled, without having registered, to vote at an election for superintendent of schools. Wagar v. Prindeville, 21 N. D. 245, 130 N. W. 224.

In several states statutes designed to secure purity in elections have been held applicable to primary elections. Such decisions proceed upon the theory that primary elections have become a part of our political system to such an extent that it may be presumed that the Legislature intended by such statute to secure the purity of such elections upon both the day for choosing candidates and the day for voting upon the candidates for office. Strasburger v. Burk (Md.) 13 Am. L. Reg. 607.

In that cited Maryland case was held void a contract whereby one of the parties, for a consideration, was to give his political influence in favor of the other and also to furnish lager beer and cigars to the voters at a nonstatutory primary election. Such a contract was held violative of public policy and of a penal statute denouncing such contracts by a candidate at "any election." The court said:

"It is clear, then, on authority, and it is equally clear on principle, that the whole con-tract in this case, if the election had been one appointed by law, would be illegal and void, because it would be in violation of the policy of the statute, as well as immoral and injudicious in tendency. But it is contended that this was a primary election, not held under the authority of law, but merely a voluntary expression of the opinions of the Democratic voters who chose to attend, and therefore that the considerations of public policy which apply to legal elections have no application to it. These primary elections, however, although they are not prescribed by law, are recognized and sanctioned by it, in that the act of 1867 (chapter 367) makes it the duty of the board of police commissioners 'to preserve order at primary meetings and elections'; in fact they have grown to be an essential part of our political system. Imperfect and unsatisfactory and liable to gross abuse as they are, they constitute almost the universal mode by which candidates everywhere are now brought before the people for their suffrages. If they are tainted by fraud or corruption, our political institutions are contaminated at their source. The same principles of public policy, therefore, which apply to elections ordained by law must for the same reasons be applicable to the primary elections."

That Maryland opinion brings out, clearly, the quasi "public" character of primary elections, even when not authorized by either Constitution or statute, invoking the exercise of the *police power* of the state, even though they are merely "political institutions," and not in any sense a part of the actual machinery of government. Said decision likewise discloses the considerations of public policy which, in certain cases, has induced courts to extend to statutory primary elections certain provisions of laws designed to promote purity in elections.

Likewise, in Indiana, it was held that a primary election is an election within the statute regulating the sale of liquor. State v. Hirsch, 125 Ind. 207, 24 N. E. 1062, 9 L. R. A. 170, discussed hereinafter. In such instances the courts have construed the statutes liberally to accomplish the legislative purpose, giving due consideration to the evil to be remedied and the appropriateness of the proposed remedy.

Elsewhere than in Texas, also and likewise, "election," as used *in even the suffrage clauses of state Constitutions*, has been treated, generally, as "open to construction," and has been construed, by the courts of numerous states. Although such constructions have not been uniform, most of them are to the effect that "election," as used in the suffrage clause of a state Constitution, does not include nonconstitutional and nongovernmental elections such as party primaries.

The Constitution of Kentucky conferred the privilege of suffrage on free white males. Held:

"This qualification for electors was intended to apply in the election of *constitutional offi-*

cers, as distinguished from those *created by legislative act.*" Buckner v. Gordon, 81 Ky. 670.

Their Constitution provided, also, that "all elections shall be free and equal." Held:

"That section of the Constitution has no reference to primary elections, but applies only to general elections."

The court said:

"If the word 'elections,' as used in the Constitution, includes primary elections, the Constitution effectually prohibits the holding of primary elections at all." Montgomery v. Chelf, 118 Ky. 766, 82 S. W. 388.

See, also, Ledgerwood v. Pitts, 122 Tenn. 571, 125 S. W. 1036; Kelso v. Cook, 184 Ind. 173, 110 N. E. 987, Ann. Cas. 1918E, 68.

However, a similar provision in the Constitution of Illinois was held applicable to primary elections.

In certain cases "election," in the suffrage clause of a Constitution, has been held to apply to public "officers" only. Coggeshall v. Des Moines, 138 Iowa, 730, 117 S. W. 309, 128 Am. St. Rep. 221; Callam v. City of Saginaw, 50 Mich. 7, 14 N. W. 677; Mayor v. Shattuck, 19 Colo. 104, 34 Pac. 947, 41 Am. St. Rep. 208; Thornton v. Washington, 3 Wash. T. 482, 17 Pac. 896; Woodley v. Town Council, 44 S. C. 374, 22 S. E. 410; Menton v. Cook, 147 Mich. 540, 111 N. W. 94; Commonwealth v. Steele, 97 Ky. 27, 29 S. W. 855; Willis v. Kalmbach, 109 Va. 475, 64 S. E. 342, 21 L. R. A. (N. S.) 1009; Belles v. Burr, 76 Mich. 1, 43 N. W. 24.

Coggeshall v. Des Moines, supra, is to the effect that the provisions of section 1 of article 2 of the Constitution of Iowa, restricting to males the right "to *vote* at all elections which are now or may hereafter be authorized by law," does not render invalid the provision in section 1131 of the Iowa Code that—

"The right of any citizen to vote at any city, town or school election, on the question of issuing any bonds for municipal or school purposes, and for the purpose of borrowing money, or on the question of increasing the tax levy, shall not be denied or abridged on account of sex."

The power of the Legislature to permit women to vote on issuance of bonds was upheld. The view of the court was that "elections," as employed in their suffrage clause, relates only *to public officers contemplated by the Constitution itself,* and does not even include elections on questions of *governmental policy,* especially where the result of such election is, at most, merely *advisory.*

In a later Iowa case (In re Carragher, 149 Iowa, 225, 128 N. W. 352, 31 L. R. A. [N. S.] 321, Ann. Cas. 1912C, 972), the Supreme Court of that state, after quoting said suffrage clause, said:

"The Legislature cannot add to or take from these qualifications, and until the people shall have changed this feature of their fundamental law, a woman cannot be a qualified elector in the constitutional sense of the term. * * * This is not inconsistent with legislative power to authorize women to vote on questions of public policy or administration submitted to the popular vote, but *not including the election or choice of officers*"—citing Coggeshall v. Des Moines.

Section 1 of article 7 of the Colorado Constitution conferred upon males the privilege of suffrage "at all elections." In holding that the Legislature might prescribe *other qualifications* for elections concerning annexation of contiguous cities and towns, the Supreme Court of that state said:

"It is manifest that some restriction must be placed upon the phrase 'all elections,' as used in section 1, else every person having the qualifications therein prescribed might insist upon voting at every election, private as well as public, and thus interfere with the affairs of others in which he has no interest or concern. In our opinion, the word 'elections,' thus used, does not have its general or comprehensive signification, including all acts of *voting, choice,* or *selection,* without limitation, but is used in a more restricted political sense—as elections of public officers. This view is consistent with the title of article 7, 'Suffrage and Elections.'" Mayor v. Shattuck, 19 Colo. 104, 34 Pac. 947, 41 Am. St. Rep. 208.

In that case the court referred to In re Nominations to Public Offices, 9 Colo. 631, 21 Pac. 474, as being "a judicial decision of our own state, limiting somewhat the phrase '*all elections,*' as used in article 7." In that cited case, in upholding the constitutionality of a statute designed to correct abuses in the nomination of candidates for public offices, the court had said:

"The abuses sought to be corrected by the provisions of the bill are of the gravest character and are a proper subject of legislation entirely within the legislative power"—citing Leonard v. Commonwealth, 112 Pa. 607, 4 Atl. 220.

The Constitution of Maryland, in section 1, art. 1, conferred upon male citizens only the right to vote "at all elections hereafter to be held in this state." In construing that provision the Supreme Court said:

"It is only at elections which the Constitution itself requires to be held, or which the Legislature under the mandate of the Constitution makes provision for, that persons having the qualifications set forth in said section 1, article 1, are by the Constitution of the state declared to be qualified electors."

Accordingly that court declared:

"We regard it as an unreasonable inference to suppose that municipal elections * * * can be properly termed elections under the Constitution, such as state and county elections."

Hanna v. Young, 84 Md. 179, 35 Atl. 674, 34 L. R. A. 55, 57 Am. St. Rep. 396, citing Florida v. Dillon, 32 Fla. 545, 14 South. 383, 23 L. R. A. 124; McMahon v. Mayor, 66 Ga. 217; Buckner v. Gordon, 81 Ky. 666; Mayor v. Shattuck, 19 Colo. 104, 34 Pac. 947, 41 Am. St. Rep. 208.

The Constitution of Virginia (article 2) gave to male electors only the privilege of voting "for members of the General Assembly and all officers elective by the people." The eighteenth section of the attached schedule provided:

"In all elections held after this Constitution goes into effect, the qualifications of electors shall be those required by article 2 of this Constitution."

In a case involving the validity of a statute the Supreme Court of Appeals held that the first quoted provision did not prevent the Legislature from prescribing different qualifications for persons who shall vote upon the question of licensing the sale of intoxicating liquors, and that the second quoted provision referred solely to elections provided for by the Constitution. Willis v. Kalmbach, 109 Va. 475, 64 S. E. 342, 21 L. R. A. (N. S.) 1009. The court said:

"This phrase 'all elections' has been frequently construed by the courts of other states"—citing note in 14 L. R. A. (N. S.) 850; Valverde v. Shattuck, 19 Colo. 104, 34 Pac. 947, 47 Am. St. Rep. 208; Graham v. Greenville, 67 Tex. 62, 2 S. W. 742; State v. Cook, 126 Ala. 600, 28 South. 745; Hanna v. Maryland, 84 Md. 179, 35 Atl. 674, 34 L. R. A. 55, 57 Am. St. Rep. 396, and other cases.

And the court added:

"The phrase 'all elections,' as must have been known to the learned lawyers in the convention, had in many states been held to refer only to such elections as had been prescribed by the Constitution itself; and, indeed, at the time the schedule was adopted, there was no decision to the contrary."

The force of that decision is emphasized by the fact that the same Constitution declared:

"The General Assembly shall have full power to enact local option or dispensary laws, or any other laws controlling, regulating, or prohibiting the manufacture or sale of intoxicating liquors."

Thus the term "all elections," as used in the Virginia suffrage clause, was denied applicability to an election which that Constitution expressly declared to be within the full power of the law-making department to authorize.

In many states it has been held that if an office be of legislative creation, in contradistinction to a constitutional office, the Legislature may prescribe qualifications of voters at a final election to fill such office. 15 Cyc.

282, 283, citing cases from Arkansas, California, Indiana, Michigan, Nevada, New Jersey, North Carolina, Ohio, Pennsylvania, Rhode Island, Utah, Wisconsin, Florida, and Kentucky. See, especially, Scown v. Czarnecki, 264 Ill. 305, 106 N. W. 276, L. R. A. 1915B, 247, Ann. Cas. 1915A, 772, and quotation from it in the majority opinion in the present case.

Frequently it has been held that if the matter to be voted upon be one outside of the provisions of the Constitution, and therefore one of merely legislative provision, the Legislature may prescribe the qualifications of voters thereon. 15 Cyc. p. 299, and cases cited. See, also, Opinion of Justices, 115 Mass. 602; Coggeshall v. Des Moines, supra; Seaman v. Baughman, 82 Iowa, 216, 47 N. W. 109, 11 L. R. A. 354.

"Unless it is expressly made so, a general election law is not applicable to primary elections, which are merely creations of political parties and associations, and may be held at such times and places and on such terms and conditions as may seem fit. But the Legislature may recognize the existence of political parties, and within reasonable limits regulate the means by which partisan efforts shall be protected in exercising individual preferences for party candidates. And this is the general purpose of primary election laws, which are designed to secure to individual voters a free expression of their will. Among other things the primary election laws usually make provision for the enrollment of the voters of the different political parties in order to prevent all persons whatever from voting in the party primaries except such as are entitled to do so." 15 Cyc. 332, 333.

Among the decisions in other states, involving the validity of certain primary election statutes, as directly related to certain provisions of state Constitutions, are these:

A compulsory primary election statute of Tennessee was attacked as being repugnant to two sections of the Constitution of that state, the first of which (section 5, art. 1) declared that "elections shall be free and equal," and the second of which (section 1, art. 4) restricted to males the right "to vote for members of the General Assembly and other civil officers for the county or district in which he resides," etc. The Supreme Court said:

"The first inquiry, therefore, presented for our examination, is whether or not these provisions of the Constitution have any application at all to primary elections. Admittedly no such thing could have been in contemplation by the framers of the Constitution when they came to formulate the election and suffrage clauses of that instrument, for at that time no such thing as a primary election had ever been suggested. The object of this modern invention of political parties is primarily for the purpose of permitting and requiring the entire electorate of that party to participate in the nomination of candidates for political office. The plan is simply a substitution for the caucus or convention. It is true, as stated, it is a part of the politi-

cal machinery that starts the candidate on his way, and the political party is thereby enabled to crystallize and concentrate its vote on that particular candidate who is chosen as the representative and expositor possibly of their political views; but the limitations and safeguards of the Constitution apply exclusively to the final election when the officer is chosen in the mode required by the Constitution." Ledgerwood v. Pitts, 122 Tenn. 571, 125 S. W. 1036.

Did that decision, under which a statute permitting women to vote in primary elections would be valid, "subvert" the Constitution of Tennessee? And in that case, after mentioning several cases there cited by counsel in support of the proposition that compulsory primary elections are "elections" within the purview of the Constitution (including Spier v. Baker, 120 Cal. 370, 52 Pac. 659, 41 L. R. A. 196, and People v. Board, 221 Ill. 9, 77 N. E. 321, 5 Ann. Cas. 562, both cited in the present case by our Chief Justice), the Tennessee court said:

"We do not subscribe to the reasoning of these cases, and, moreover, they are opposed to the great weight of authority."

The Constitution of Ohio (article 5, § 1) defined the qualifications of an "elector," limiting the electoral privilege to males, and provided that electors should be entitled to vote "at all elections." A primary election statute of that state was attacked as invalid upon the ground that it added qualifications not prescribed by the Constitution, in that it required that the elector should have voted at the last general election with the political party holding such primary. On that subject the Supreme Court said:

"If this contention is sound, then every elector has the constitutional right to vote at the primary election of every party. * * * A primary election, held merely to name the candidates of a political party, is not an election within the meaning of this section of the Constitution." State v. Felton, 77 Ohio St. 554, 84 N. E. 85, 12 Ann. Cas. 65.

The Constitution of Indiana (article 2, § 2) restricted to males the privilege of voting "in all elections not otherwise provided for by this Constitution"; it provided (article 2, § 13) that "all elections by the people shall be by ballot"; and it declared (article 2, § 1) that "all elections shall be free and equal." In holding those and other provisions of that instrument inapplicable to compulsory "primary elections," the Supreme Court of that state said, in 1895:

"In determining the question of the application of section 2 of article 2, supra, to this act, it is insisted that the term 'all elections' must necessarily comprehend the broadest definition of the word 'election'; that a primary election clearly falls within the scope of the definition of 'all elections,' though it be conceded that there is a radical difference between an election of

public officers and a primary one to select candidates for office by a political organization. * * * To claim that the people * * * intended the term 'all elections' to include elections of officers of churches, private corporations and militia companies would be absurd, and we are forced to conclude that a limited definition must be accorded the term. Conceding some limitations, however, is the term still broad enough to include primary elections? The intent of the people in adopting a constitutional limitation must be given effect when ascertained. In seeking this intent, if concealed in ambiguous phraseology, courts may properly resort to other relevant provisions of the instrument, to the history of the times, the then existing laws, the mischiefs existing, and the appropriate remedies."

Further on, after referring to section 2, art. 2, of their Constitution, prescribing disqualification as a punishment for bribery in securing one's own election to an office, the court quoted from and reaffirmed its former decision in Gray v. Seitz, 162 Ind. 1, 69 N. E. 456, wherein it was said:

"It seems perfectly clear that section 6, art. 2, * * * applies only to bribes * * * given or offered to secure the election of a candidate at a final or popular election. No mention is made of a primary election, and the language used refers exclusively to the election by virtue of which title to the office is claimed."

The court continued:

"Appellant Kelso claims that the opinion declares an erroneous doctrine. We cannot assent to such conclusion. * * * To assume that section 2, art. 2, covers primary elections, implies that no lawful primary can be held. * * * If that section controls, any elector of the precinct, though avowedly an adherent of no party, may participate upon equal terms with party adherents in selecting its candidates, and the adherent of one party, with only single candidates for nominations, might, with safety to his own party, go into the camp of his political adversary and maliciously vote for its most unworthy candidates with the deliberate purpose of wrecking it." Kelso v. Cook, 184 Ind. 173, 110 N. E. 987, Ann. Cas. 1918E, 68.

The Washington Primary Election Law of 1907 (Laws 1907, p. 464) contained section 12, imposing, as a condition for participation in the primaries, a pledge of party fealty. In sustaining its validity the Supreme Court of that state said:

"It is contended that this section adds a requirement to the qualifications of electors in addition to the constitutional requirements, and for that reason renders the entire act void. Were the primary election so far such an essential part of the general election as to make the constitutional provision relating to the qualification of electors entitled to vote at the general election applicable thereto, then there would be force in this objection; but we do not think the sections of the Constitution providing the qualifications of electors applicable to the primary election provided for by this statute. It is not

the purpose of the primary election law to elect officers. The purpose is to select candidates for office to be voted for at the general election. Being so, the qualifications of electors provided by the Constitution for the general election can have no application thereto." State v. Nichols, 50 Wash. 508, 97 Pac. 728.

Did that decision do destructive violence to the Constitution of that state?

The Supreme Court of Nevada said:

"Counsel for appellant seemingly fail to appreciate that the electoral test of an elector spoken of in the Constitution is for the election of public officers, and not for the election of which party nominees are selected." Riter v. Douglass, 32 Nev. 400, 109 Pac. 444.

The Constitution of North Dakota, in section 121, restricted to "males" the definition of "a qualified elector." The Legislature there enacted a statute providing for a classification of qualified "electors" according to their political beliefs, supported by affidavit of party fealty, and restricting, accordingly, participation in "primary elections." In a suit to test its constitutionality the respondent, and also the Attorney General, contended that—

"a primary election is an election within the meaning of that term as used in the Constitution, and the qualification of electors at such primary are the same as at general elections, and that chapter 213 of the Laws of 1911, by exacting an oath of party allegiance as a condition precedent to the right to vote at the primaries, is in effect requiring an additional qualification of an elector as a condition precedent to his right to vote, besides those mentioned in section 121, defining his qualifications and guaranteeing every male person with those qualifications, who shall have resided in the precinct for a certain time 'next preceding an election shall be a qualified elector at such election."

The court said:

"Logically the first question to determine is whether the primary election is an election within the meaning of section 121, as amended. * * '* In our state the primary is the means of nomination of all officers, state, district, and county, as well as the method of choice by election, instead of nomination, of all party committeemen and delegates belonging to the party organizations of those parties entitled to participate at the primaries. The election is held at public expense and is state-wide; all nominations occurring throughout the state at the same election. In one sense the state-wide primary is a state-wide election. As to time and method used to accomplish the results, it is such. But as to *purpose and results achieved, as to nominations made, it is in no sense an election,* unless it be a party or partisan election." State v. Flaherty, 23 N. D. 324, 136 N. W. 80, 41 L. R. A. (N. S.) 132.

The statute was held valid. Inferentially the court there assumed that the Legislature would be powerless to provide such a test of party fealty as a condition precedent for

participation in a "general election"; hence the importance which that court attached to the inquiry as to whether a "primary election" was or was not an "election" within the meaning of said suffrage clause. The decision of that court rested upon its negative reply to that question.

It must be admitted that in a former case that court had declared that a "primary election" was an "election" within the meaning of their suffrage clause. Johnson v. Grand Forks County, 16 N. D. 363, 113 N. W. 1071, 125 Am. St. Rep. 662, decided in November, 1907, the opinion of the court in that case being by Spalding, Justice. But the force of that earlier pronouncement was impaired, at the time, by the fact that the case was not such as to render any decision on that point necessary, and in two later cases, by that same court, it was referred to, substantially, as *dictum*. More than four years later, in March, 1912, in a case having the same style, reported in 22 N. D. 613, 135 N. W. 179, the same court, *through the same spokesman,* expressly pretermitted 'a decision as to whether a primary election was an "election" within the meaning of that word as used in the Constitution of North Dakota, saying, with reference to said former decision:

"The writer, at least, has been long of the opinion that a discussion of that question was unnecessary in the former case, and that, while the primary election may not be an election, within the terms and meaning of the Constitution, fixing the qualifications of voters and candidates, to the full extent which that opinion appears to hold, yet that the legislative assembly cannot add to or take from such qualifications, *further than is necessary to effect the purpose sought to be accomplished in providing a primary election law."*

And the court added this:

"We, however, do not pass upon this question, further than to say that, conceding, for the purposes of argument, all that appellant says in his brief would not change the result, and this question not having been discussed by respondent, and only suggested by appellant, and no authorities cited which are in point, we leave it for consideration when it is properly raised and discussed by counsel."

Some two months still later, in State v. Flaherty, supra, the same court said:

"Although the questions here involved were not necessary to a decision of those questions, the court in the former held a primary election to be an election within the meaning of section 121 of the state Constitution. Johnson v. Grand Forks County, 16 N. D. 363, 125 Am. St. Rep. 662, 113 N. W. 1071. * * * This court has later, in Johnson v. Grand Forks County, —— N. D. ——, 135 N. W. 179, during this present year, qualified the holding in the other case of the same title, 16 N. D. 363, 125 Am. St. Rep. 662, 113 N. W. 1071."

And thereupon, in State v. Flaherty, the question as to the restrictive effect of their

suffrage clause (section 121) being squarely before the court and carefully briefed by both sides, that court, reversing its former holding on the point, as above indicated, answered that question *negatively,* and expressly declared that, although in that state primary elections were state-wide and "held at public expense," and while a primary election is therefore "in one sense * * * a state-wide election," nevertheless, "as to purpose and results achieved, as to nominations made, it is in no sense an election, unless it be a party or partisan election." The repudiated doctrine is that upon which the dissenting opinion in the present case mainly rests.

Article 7 of the Minnesota Constitution conferred upon male persons the right to vote "for all officers that now are, or hereafter may be, elective by the people." Concerning it, as related to primary elections, the Supreme Court said:

"If the election of candidates to the position of nominees is an election within the meaning of article 7 of the Constitution, then the primary law, as above construed is unconstitutional. It would, in certain cases, deprive the voter of his privilege to exercise the elective franchise. * * * But it is very clear that the election of nominees provided for in the primary law is not the election referred to in the Constitution. * * * By 'officers' is meant the executive or administrative agents of the state or the governmental subdivisions thereof, and the election mentioned has reference only to the selection of persons to fill such offices. The election thus defined cannot reasonably be given so broad an interpretation as to include the selection of nominees for such offices." State v. Johnson, 87 Minn. 221, 91 N. W. 841.

Did that decision, under which the Minnesota Legislature validly might have permitted women to vote in party primaries, render the Constitution of that state "a vain and useless document"?

From the foregoing it is evident that the broad rule laid down by courts, generally, outside of this state, is that such suffrage provisions of state Constitutions refer, usually, to governmental elections, such as "general elections," and are not applicable to primary elections and primary conventions. The undeniable truth about the whole matter is that the weight of authority throughout the country, in numbers and in cogency of reasoning sustains the original decision of this court in the present case.

To the same effect are all of the most applicable, as well as the latest prior decisions of our own Supreme Court. Graham v. City of Greenville, State v. Waxahachie, Waples v. Marrast, and Beene v. Waples, all supra. *There has been no decision of this court to the contrary.*

Graham v. Greenville, 67 Tex. 62, 2 S. W. 742, decided in 1886, involved a construction of a kindred clause in the same suffrage article of our Constitution, and presented a

question of legislative power to provide for annexation to a city' of adjoining territory, otherwise than by "a public election" at which all votes should be cast "by ballot"; it being provided, then as now, by our Constitution that "in all elections by the people the vote shall be by ballot." Article 6, § 4. The applicable statute provided for such annexation "whenever a majority of the inhabitants qualified to vote for members of the state Legislature * * * shall vote in favor of becoming a part of said city," etc. R. S. 1879, art. 503. No public election was held; but the "vote" on annexation was taken, simply and solely, by a written petition, reciting that "we, the undersigned, whose names are hereto subscribed, declaring our vote in favor of or against annexation of territory," etc., the names of subscribers appearing beneath, in parallel columns, headed, respectively, "For Annexation" and "Against Annexation," a large majority of the names being in the first column. Thereupon, by ordinance and proclamation, the additional territory was declared annexed to the city.

The suit was to test the validity of such annexation, the ground of attack being that the vote was "taken otherwise than by ballot," which was alleged to be in contravention of said section 4. This court held the annexation valid, and in so doing expressly declared said provision of section 4 *inapplicable to the facts of that case,* in that there had been no "public election" to which said provision of the Constitution could apply. The court held that the Legislature had full authority to prescribe the manner in which the wishes of a majority of the residents of the adjoining territory were to be ascertained—in manner directed by said statute "as well as by the votes given at a public election." "Yet," this court declared, "it is only in the *latter case* that the provision of the Constitution as to voting by ballot would have any application." That opinion was prepared by Chief Justice Willie, and was fully concurred in by Mr. Justice Stayton and by Mr. Justice Gaines, each of whom, in turn, afterward became Chief Justice of this court. In so declaring that such taking of a statutory "vote" on annexation did not constitute an "election" within the meaning of section 4 of that article of our Constitution which for more than forty years has been entitled "Suffrage," did that trio of distinguished jurists "subvert" or "impoverish" that article, and render it "vain and useless"?

That decision was affirmed and followed by this court, unanimously, in State v. Waxahachie, 81 Tex. 626, 17 S. W. 348 (decided in 1891), the opinion being by Mr. Justice Henry. See, also, Seaman v. Baughman, 82 Iowa, 216, 47 N. W. 1091, 11 L. R. A. 354; Pritchard v. Magoun, 109 Iowa, 364, 80 N. W. 512, 46 L. R. A. 381. Obviously, on principle, and

under the authorities generally (and especially according to each of the tests prescribed by Chief Justice Phillips in Waples v. Marrast, supra), the taking of said statutory "votes" on annexation came nearer being a "public election" on a "governmental" issue than does the making of nominations of candidates by party primaries. If, as this court unanimously held in those two cases, such statutory and *final* "voting" on annexation did not constitute such "a public election" as to render applicable said provision of article 6 concerning the *manner* of voting ("by ballot"), how, reasonably, can it be said (and why should this court now hold) that the making, in political primaries, *of nominations of candidates* for offices (to be *finally* voted upon, in the general election, by all qualified "electors"), constitutes such a "public election" as to render applicable to it the provisions of that same article stipulating *who may cast these ballots?*

Both on the facts and because both Graham v. Greenville and State v. Waxahachie involved the construction of the word "election" as used in one and the same article of our Constitution, and it being the article dealing directly and exclusively with "Suffrage," those cases are much more analogous to the present case than is Ashford v. Goodwin, 103 Tex. 491, 131 S. W. 535, Ann. Cas. 1915A, 699, which is relied upon by our Chief Justice, and which deals with a different subject-matter, under a different article (article 5), directly involving *jurisdiction of courts.* Ashford v. Goodwin will be discussed hereinafter.

The meaning and legal effect of Waples v. Marrast, 108 Tex. 5, 184 S. W. 180, L. R. A. 1917A, 253, and its direct and controlling applicability to the certified question in the present case, in support of the negative answer heretofore made thereto, are certain. The opinion therein is clear and unambiguous. The issue was whether, constitutionally, the Legislature might authorize the expenditure of "public" funds in payment of primary election expenses. The decision was in the negative. Thereby the presidential primary election statute of 1913, which undertook so to do, was held void, as being repugnant to the restrictive provisions of article 3, section 52, and of article 8, section 3, of our state Constitution, which declare, in substance, that "public" funds shall not be used for other than public purposes. Why did this court so hold? Its unanimous opinion in that case, prepared by Chief Justice Phillips (who wrote the dissenting opinion in the present case), declared, in substance, that it was simply because "primary elections" are not for any "governmental" purpose, but are for merely "party" purposes. Note that fundamental distinction. It fits the certified question in the present case even as a glove fits the hand.

Our state Constitution does not inhibit payment of expenses of "general elections" out of public funds. That proposition receives universal assent. In Waples v. Marrast the power of the Legislature to authorize payment of expenses of general elections out of public funds was expressly *declared*, but corresponding power of the Legislature to authorize payment of expenses of "primary elections" out of such funds was expressly *denied.* The line of cleavage is very plain. Thus the question as to the constitutionality of that primary election statute was declared to turn upon *the character of the "election."* Under the test there prescribed, if the election" should happen to be a "governmental" election—such as a "general election"—a statute authorizing payment of its expenses out of "public" funds would be valid; but, if the "election" should happen to be a *nongovernmental election*—such as a "primary election"—a statute authorizing payment of its expenses out of such funds would be invalid. In that opinion, in contrasting "primary elections" with "general elections," the searching language of Chief Justice Phillips concerning "primary elections" was:

"They perform no governmental function. They constitute no governmental agency." "They do not concern the general public." "Political parties are political instrumentalities. They are in no sense governmental instrumentalities."

All that being true, the statute then before the court was unconstitutional, beyond all reasonable doubt. Obviously the effect of said decision in Waples v. Marrast, as elaborated in said opinion of this court in that cause, and as reaffirmed, shortly afterward, by this court in Beene v. Waples, supra, was to *classify* "elections" into *two essentially and fundamentally different classes:* First, "governmental" elections, including "general elections"; and, second, *nongovernmental* elections, including "primary elections." That stated distinction between "elections" of different kinds was there expressly declared by our Chief Justice, for a unanimous court, to be of sufficiently grave importance to determine the validity or invalidity of the primary election statute then under review, and that statute was held invalid, although every member of this court then, as now, firmly believed, concerning the work of the Legislature, that "any doubt as to the validity of its legislation is to be resolved in its favor," as declared, in the present case, by our Chief Justice.

The decision in Waples v. Marrast was entirely consistent with that *classification* of elections. Indeed, that classification compelled that decision, just as it now strongly supports the decision heretofore made by this court in the present case, to the effect that the general power of the Legislature over "primary elections" is not restricted by the

suffrage clause of our Constitution. The controlling and determining distinction in Waples v. Marrast was, and in the present case is, that, unlike general elections, "primary elections" cannot successfully stand the rational and generally recognized tests as to what are and what are not "governmental elections"—"elections" within the meaning of provisions of our state Constitution which were designed to restrict or limit legislative power and authority, such, for instance, as said section 52 of article 3, and section 3 of article 8, in Waples v. Marrast, which were intended to restrict, somewhat, the use of public funds, and said section 2 of article 6, in the present case, embracing said suffrage clause, which was intended to restrict, somewhat, the right of suffrage.

In Waples v. Marrast, first establishing, and then observing and enforcing, the stated *distinction* between different kinds of "elections," necessarily involving said classification of "elections" into said *two classes*, this court consistently held that said two clauses of our state Constitution which restricted the use of public funds are applicable to "elections" falling in one of those classes, but wholly inapplicable to "elections" falling in the other class.

In the present case, recognizing and carefully observing that very classification of "elections," and consistently with that classification, this court held that the restrictive suffrage clause of that same Constitution is applicable to elections falling within one of those selfsame classes, "governmental elections," such as "general elections," but inapplicable to elections falling in the other class, *non-governmental elections*, including "primary elections" and "primary conventions."

That classification of elections, made in Waples v. Marrast and faithfully applied in the present case, is identical—common to both cases, the same in each case—although in each of the two cases a different restrictive provision of our Constitution was applied to that class which includes "primary elections." In both cases the classification of primary elections as *non-governmental elections* is a common factor. To that extent, therefore, Waples v. Marrast and the present case unquestionably occupy common ground.

Upon that identical classification of "elections" this court held, in Waples v. Marrast, that, inasmuch as "primary elections" are not for any "governmental" or "public" purpose, expenses thereof cannot, validly, be paid out of public revenues; and upon that same classification of "elections" this court consistently held, in the present case, that *for the very same reason*, reinforced by the historic signification of the word "election" in suffrage clauses of other state Constitutions, "primary elections" are not within the legal effect and operation of the restrictive provision of the *suffrage clause* of our own state Constitution.

Consequently, if, as declared by our Chief Justice, the decision in the present case does, indeed, amount to a subversion of our Constitution, making of it "a vain and useless document," the error lies in said *classification* of "elections"; in treating "primary elections" as not being for any "public" purpose, as not being for "governmental purposes" for which, alone, "the powers of the state as a sovereignty exist," as performing "no governmental function," as constituting "no governmental agency," as being "in no sense governmental instrumentalities"; but, on the contrary, as being, indeed, for mere "party" purposes, as existing, primarily, for the attainment of the "objects of political organizations" which are "intimate to those who compose them," but which "do not concern the general public," in a *governmental* sense, beyond the due application of the police power of the state. In other words, the error, if any, in the decision of this court in this case consists in treating "primary elections" as belonging in the *very class* in which they were placed by this court in Waples v. Marrast, the author of said dissenting opinion in the present case then being spokesman for a unanimous court, and again in Beene v. Waples, that member concurring,

But if that former judicial classification of "elections" into two classes—first, governmental elections; and, second, *non-governmental* elections—was sound and correct in 1916, and properly applicable, by this court, in Waples v. Marrast and in Beene v. Waples, in testing the constitutionality of said two primary election statutes of 1913, why was not that selfsame classification of "elections" sound and properly applicable in 1918, when the Legislature had said statute of that year under consideration, and again in 1920, when the courts are passing upon the question of its constitutionality? If, without subverting our state Constitution, "elections" are, indeed, subject to said classification in determining whether its restrictions upon legislative action *concerning the use of public funds* do or do not apply to "primary elections," why, without violence to that same Constitution, may not, and why should not, that identical classification of elections be applied, again (in the present case), in determining whether constitutional restrictions upon legislative action concerning the *right of suffrage* do or do not apply to "primary elections" and to "primary conventions"? In each instance the sole purpose and function of the courts is fairly to ascertain, and impartially to apply, the real meaning and legal effect of plainly "restrictive" (though separate) provisions of the same Constitution, which was framed in the convention and adopted at the polls as a "governmental" measure, dealing, in a practical way, with "governmental agencies," rath-

er than with mere "party" affairs. If said classification of elections is not applicable to the issue in the present case, why is it not so applicable? Where, if at all, does the analogy, in principle, break down? The foregoing questions have not been satisfactorily answered.

Said dissenting opinion in the present case does not now deny the correctness of said classification of "elections" as related to the authority of the Legislature over "public" funds, although it does deny that such classification is properly applicable as related to the authority of the Legislature in the matter of suffrage. In what, if any, sense, applicable to this case, may an election which is not for any "public purpose" be a "public election"? If, as declared by this court in Waples v. Marrast, primary elections "constitute no governmental agency," "perform no governmental function," and "do not concern the general public," how, in the present case, involving a grave question as to *the restriction of general legislative power and authority* relating to the privilege of suffrage, can such elections fairly be called "public elections" and be treated by the courts as "governmental elections," belonging to the same class as "general elections," and, consequently, within the restrictive operation of our said suffrage clause? Under present circumstances to call primary elections "public elections" would seem to be a mere play on the word "public"; and to hold such elections to be "governmental elections," and consequently within the restrictive operation of said suffrage clause, would amount, practically, to an utter repudiation of the doctrine, or principle, which controlled the unanimous decision of this court in Waples v. Marrast.

In answering said certified question, in determining the true intent and operation of our said suffrage clause, this court has applied, in this case, those selfsame tests to primary elections and primary conventions —mere "political instrumentalities * * * in no sense governmental instrumentalities" —with the inevitable result that, logically, in this case (as in Waples v. Marrast) "primary elections" have been found and declared by this court to fall in a class essentially different from "governmental elections," to which, alone, said restrictive provision of the suffrage clause of our Constitution has been held, by this court, to be fairly applicable.

[14] "Governmental elections" are elections —such as "general elections"—which directly and finally affect all the people of the included territory, and which determine, *finally*, who shall hold public office or whether a particular governmental policy shall or shall not prevail. Assuming, in the light of history, that our said suffrage clause deals with only such "elections" as subserve some direct "governmental" purpose, it is very evident that the *class* of "elections" which does lie within the restrictive meaning and legal operation of our said suffrage clause does not include "primary elections" or "primary conventions," which have none of the aforesaid characteristics, but which, on the contrary, do not *legally* affect or concern all the people within the involved territory, but, at most, relate to only party affairs, and are merely advisory, and do not *finally determine, in contemplation of law*, who shall hold any office, or whether any particular "governmental" policy shall or shall not be adopted.

That being true, and there being, admittedly, no other restriction upon the general authority of the Legislature in the premises, "primary elections" and "primary conventions" are subject, as a necessary consequence under our form of government, to all reasonable regulation and control by statute, at the discretion of the Legislature, including permission to women to vote therein, subject to proper and contemplated tests of party fealty. Clearly and undeniably, *on principle*, the cardinal, the fundamental, the controlling distinction, upon which the vital question here at issue—the certified question—properly turns, is the hereinabove stated distinction between "governmental elections" and "primary elections." How, then, reasonably, may "primary elections" be called "public elections," and be so treated by the courts, even to the extent of striking down an act of the Legislature (such as said statute of 1918), in which they are classified and treated as not being "public elections" in a governmental sense?

The inexorable logic of the situation is, either that said decision in Waples v. Marrast and the decision in the present case were both wrong, or that they were both right. It is as clear as the noonday sun that, necessarily, the same stated principle is applicable, harmoniously, to both cases. If the stated distinction between said two classes of "elections" is *unsound*, if all "elections" which are authorized or which may be authorized by law belong in the *same class*, as all being governmental elections, then the ground of this court's decision in Waples v. Marrast sinks out of sight and is wholly untenable; but if that decision was *sound*, and stood upon an enduring foundation (based, as it was, upon such classification of "elections"), then that decision is properly applicable, with controlling force, in the present case, as pointed out in said majority opinion, compelling a negative reply to said certified question. Why, *as a matter of law*, should not this court's decision in Waples v. Marrast be followed and applied in this case?

On its merits, precedents aside, is said classification of elections into "governmental elections" (including general elections) and "non-governmental elections" (including primary elections and primary conventions) sound and correct, justifying this court in

standing by it, or is it erroneous and unsound, necessitating abandonment? Both on principle and when tested by the best authorities extant, that classification is correct, and should stand. "Governmental" elections, such as "general elections," certainly do perform, *finally*, a distinct "governmental" purpose, affecting all the people of the involved territory, in the election of individuals to fill offices, and in the actual adoption or rejection of governmental policies. Taxes are collected from practically all the people, for whose benefit the government is maintained. Why should not tax moneys, or any other public funds, be used in defraying expenses of elections of *that class?* In that respect the Constitution reasonably does not seek to limit the general power and authority of the Legislature, which, consequently, is left free, in the exercise of its general law-making authority, to authorize payment of such expenses out of public funds. Upon these considerations the restrictive provisions of our Constitution, which denounce the use of "public" funds for any except "public purposes," were declared inapplicable to "general elections." Waples v. Marrast. Upon the other hand, primary elections are not, in Texas, part and parcel of the machinery of government, as they are now in several states by virtue of express provisions (generally amendments) of their state Constitutions. Their action does not, in contemplation of law, determine, *finally,* who shall fill any office, or whether any governmental policy shall or shall not prevail; their action is merely *advisory;* and, from a legal standpoint, it affects only adherents of a particular political "party." Upon these considerations, said restrictive constitutional provisions concerning the use of public funds were held applicable to primary elections. Waples v. Marrast. Manifestly, upon the merits (and extraneous of all precedents in such matters), the indicated distinction between those two kinds of "elections" is inherent, existing naturally, inevitably, and with classifying force and effect. Nowhere, perhaps, has that important distinction been drawn so graphically and clearly and finely as by Chief Justice Phillips in Waples v. Marrast. The course of reasoning, there followed, in its support, is fairly indicated by the quotations therefrom set out in the majority opinion in the present case. In support of the classification of "elections" which this court observed and followed in the present case, that cogent opinion in Waples v. Marrast is here adopted, not in the nature of a precedent alone, but as supplying a conclusive argument, on the merits, in support of the negative reply which this court made to said certified question in the present case.

Moreover, as shown in said majority opinion, and hereinabove, that same classification of "elections," involving the stated distinction between "primary elections" and "gov-

ernmental elections," has been recognized and upheld and applied by the courts in almost every state in which the question of the effect of such a suffrage clause upon the Legislature's authority in matters affecting restricted suffrage of women has been considered. Upon that point see, especially, these cases: Hanna v. Young, 84 Md. 179, 35 Atl. 674, 34 L. R. A. 55, 57 Am. St. Rep. 396; Ledgerwood v. Pitts, 122 Tenn. 571, 125 S. W. 1036; Willis v. Kalmbach, 109 Va. 475, 64 S. E. 342, 21 L. R. A. (N. S.) 1009; State v. Johnson, 87 Minn. 221, 91 N. W. 604, 840; Kelso v. Cook, 184 Ind. 173, 110 N. E. 987, Ann. Cas. 1918E, 68; State v. Nichols, 50 Wash. 508, 97 Pac. 728; Line v. Board, 154 Mich. 329, 117 N. W. 730, 18 L. R. A. (N. S.) 412, 16 Ann. Cas. 248. To like effect are many other cases cited in said majority opinion and hereinabove.

As applicable to the certified question before this court, a careful study of the stated distinction between "elections" of different kinds, involving, necessarily, the stated classification thereof, leads, inevitably, to these pertinent conclusions, which are based upon both reason and authority:

[15] (a) Our state Constitution was adopted at the polls on February 15, 1876, and speaks from that date. Campbell v. Fields, 35 Tex. 752; Peak v. Swindle, 68 Tex. 250, 4 S. W. 481; In re Deckert, 2 Hughes' Civil Cases, 187, Fed. Cas. No. 3,728. Since then its suffrage clause has undergone no change, except in respect to naturalization and poll taxes. Consequently, in determining whether it was intended to prohibit the Legislature from enacting a statute conferring upon women the privilege of voting in party primaries, conditioned on party fealty, it is essential that there be ascertained the true meaning and legal effect of "election" as then used throughout that Constitution, and more particularly in the article thereof dealing specifically with "Suffrage." Article 6.

[16] (b) Not all of the "restrictions" which our Constitution imposes on legislative action concerning "elections" are applicable, indiscriminately, to *all elections.* Whether a particular "restriction" of that general nature is or is not applicable to a particular "election" depends upon the *character of that election.*

(c) One such restrictive provision of even the suffrage article of our Constitution (section 4 of article 6, relating to voting "by ballot") was held inapplicable to the statutory plan of voting on annexation of adjoining territory to a city. Graham v. Greenville and State v. Waxahachie, supra.

(d) The applicability of at least two such restrictive provisions of our state Constitution (section 52, art. 3, and section 3, art. 8, relating to the use of "public" funds), for cogent and unanswerable reasons, have been held to depend, specifically, upon whether the

election in question was or was not for a strictly "governmental" purpose. Waples v. Marrast, supra.

(e) That same distinction between "governmental" and "non-governmental" elections reasonably may have been, and probably was, in the minds of our own Constitution makers when they embodied in that instrument (in section 2 of article 6) the similar restrictive provision concerning the privilege of suffrage.

That conclusion flows, logically, from a study of our Constitution as a whole, regardless of decisions from other states; and the same conclusion flows, likewise, from a study of pre-existing Constitutions of other states, and decisions construing them. However, discarding, for the moment, all former decisions bearing upon the point, what sound original reason can be offered in support of the view that a "restriction" upon legislative power, found in a provision of a Constitution (whose primary and fundamental purpose, most assuredly, is to deal with strictly *governmental* affairs), should be construed and extended, by the courts, to include purely "party" affairs—should be so extended to matters not directly, or finally, or in contemplation of law, affecting either the "government" or the entire body of the people? None has been suggested. There is none.

In our present Constitution, as originally adopted, the word "election" occurs in various articles, and that is true of "electors" also; but in no such instance is there made any express mention of "primary elections," and probably in no such instance is the context such as to render either of these words reasonably applicable to party primaries. The minds of our fathers, in framing and adopting that instrument, seem to have been on the fundamental principles of government, and on providing machinery for perpetuating them, and on declaring certain restrictions upon legislative power in matters involving pre-existing and inherent rights and liberties, rather than on prescribing limitations upon the power of the Legislature to deal with political parties and their affairs. Except where otherwise expressly indicated (as in section 41, article 3, relating to a viva voce vote in "elections by the Senate and House of Representatives"), the word "election" throughout our Constitution as originally adopted seems to have been used strictly in the sense of "elections by the people," and not merely a part of them, as adherents of only one political party.

Indeed, in one section of our suffrage article (section 4 of article 6, requiring that "the vote shall be by ballot"), the provision is that "in all elections by the people," etc. In that instance, obviously, that expression was employed to mark the distinction between an ordinary "election" and "elections by the Senate and House of Representa-

tives," treated of in article 3, supra. Its use in declaring the class of elections wherein "the vote shall be by ballot" indicates, very clearly, the conception of the meaning of "election" which impelled its use throughout that entire suffrage article, without the addition of any words expressly extending its meaning to embrace (as in various other states at that time) all elections then or thereafter to be "authorized by law."

At the very outset, therefore, the presumption is against the view that "election," as used in our said suffrage clause, fairly applies to *all elections*, including *non-governmental* elections, such as a primary election or a primary convention. And supporting that presumption are said decisions of this court in the four hereinabove cited cases, and also the decisions of nearly all courts of last resort in the United States; which have passed upon the issue as to whether such a suffrage clause does or does not include party primaries. The fair conclusion is that, upon the merits, and even aside from all thought of duty resulting from reasonable doubt as to the invalidity of said statute of 1918, said certified question should be answered negatively, as this court heretofore answered it.

The foregoing is intended to present a constructive view as to whether said certified question should be answered affirmatively or negatively.

Said dissenting opinion asserts that the decision of this court in this case "affirms * * * the authority of the Legislature to say what persons or classes of persons shall exercise the rights and privileges of members of the political parties of this state, and thus, at its will, constitute them members of those parties." On the contrary, said decision means that the suffrage clause in our Constitution was never intended to give to all constitutional "electors," regardless of their political beliefs or views, free entrée into all party councils. The practical effect of said dissenting opinion, if it were carried into operation, would be to admit all who are qualified to vote in general elections into all statutory primary elections and into all statutory primary conventions; but the effect of the decision of the court is to recognize and uphold the power of the Legislature to preserve, through reasonable party tests, the integrity of party organizations.

Said statute of 1918, to which said certified question refers, does not attempt to admit to party organizations individuals who are not adherents of any political party, nor does it seek to authorize adherents of one political party to participate in any primary election or primary convention or caucus of any other party. The established statutory regulations concerning tests of party fealty are left undisturbed. Said decision, in terms, merely affirms the power of the Legislature to forbid

exclusion of women adherents of a party from its primaries *solely on account of her sex*—"only this, and nothing more."

Said dissenting opinion adverts to an apprehended extension to minors and to felons of the privilege of voting in primary elections, and also to an apprehended denial to voters of privilege from arrest during their attendance at such elections, etc. Neither of those matters is mentioned in the certified question; hence neither is now before the court. The statute here now under review, and the certified question, relate, alike and *solely*, to the extension, to *women only*, of a restricted right of suffrage. The issue here is only as to the existence of a presently asserted legislative power, and not as to a remote possibility of a future abuse of power. The authority of the Legislature to enact said statute of 1918 cannot be determined by consideration of such extraneous matters.

Said dissenting opinion inquires why, if "election," as used in our suffrage clause, applies to "an election to determine whether pigs may run at large in a justice precinct," does it not apply, also, to a state-wide primary election? That conundrum presents no real difficulty. Its answer may be found in its proponent's opinion in Waples v. Marrast, supra. Our Constitution expressly authorizes the Legislature to "pass laws for the regulation of live stock and the protection of stock raisers in the stock-raising portion of the state, and exempt from the operation of such laws other portions, sections, or counties." Article 16, § 23. The exemption feature is exceptional; the general rule being that laws shall operate uniformly throughout the state. But the Constitution makes no mention of "primary elections" or of "primary conventions." Moreover, elections to determine whether "pigs" (or other live stock) shall be permitted to run at large are open to all qualified electors in the affected territory; whereas only adherents of a particular political party may vote in a party primary. Furthermore, a live stock election is *finally determinative* in character; whereas a party nomination is merely *advisory*. The two classes of elections are of essentially different character or classes—the latter being *nongovernmental*, the former being strictly "governmental" in constitutional mention, in purpose, and in legal effect.

Said dissenting opinion contains the following:

"It begs the question to say that the 'elections' referred to in this section mean only the elections provided in other parts of the Constitution. The Constitution itself nowhere says that. What warrant has a court in saying it? How does it know that that is true? What liberty has it to read any such provision into the Constitution?"

This court has not done that in Waples v. Marrast, or in Beene v. Waples, or in the present case. In each such instance it has clearly recognized the applicability of said suffrage clause (in full restrictive effect) to *all governmental elections*, including those not mentioned or provided for in the Constitution, but authorized by statute only. Courts of certain other states have, indeed, held the suffrage clause of their Constitutions applicable to only elections provided for by or mentioned in such Constitution, and in some states the courts have gone to the extent of holding such suffrage clause applicable to only elections for constitutional officers, or other officers. But all such decisions as were cited in said majority opinion in this case, or herein, have been cited merely to show that "election" in such suffrage clauses has been treated, generally, as open to construction, and to show the general drift of courts throughout the United States against a construction of that word which would include party primaries, the general effect of nearly all the decisions being that it is a mere *play on words* to treat a party primary as being, really, an "election" in contemplation of a state Constitution. An exceptional instance occasionally occurs wherein the constitutional meaning of the word "election" is extended, by the courts, as a *remedial* measure—involving exercise of the police power—to enforce purity in even non-governmental elections.

That a Democratic nomination for the office of county treasurer of Wheeler county was not an *election* to that office, although in that county "the great preponderance of the vote was Democratic, and the real contest for the office was in the Democratic primaries, and the nomination thereat was equivalent to an election," was declared, in substance, in January, 1918, by our Court of Civil Appeals at Amarillo. Carver v. Wheeler County, 200 S. W. 537. See, also, Haas v. Neosho, 139 Mo. App. 293, 123 S. W. 473.

The decision in this case does not mean, as said dissenting opinion suggests, that "there are no individual rights, no personal liberties, in this state that are not held at legislative sufferance." Nor is there in the majority opinion any support whatever for the assertion, in said dissenting opinion, that said decision "unsettles the basis upon which until now the inherent, natural rights of the citizens of Texas have rested." What particular inherent or natural right of any citizen has that decision restricted, unsettled, or disturbed? Absolutely none. Participation in party primaries is entirely voluntary; there is no compulsion about it. How, then, can a primary election law invade or affect any natural or inherent right of a citizen? 9 R. C. L. p. 1077, and authorities cited.

Much of said dissenting opinion is devoted to platitudes (in which, of course, everybody concurs) concerning the inestimable privileges of constitutional government, and the

sacredness of natural and inalienable rights of citizens guaranteed by the Bill of Rights in article 1 of the Constitution of Texas. But what particular right or privilege, mentioned in or referred to by said Bill of Rights, is in any wise destroyed or questioned by said decision in this case? What particular one or more of the 29 separate sections of said Bill of Rights does said decision "subvert"? Not one of them is specified, numerically, in said dissenting opinion.

The particular right of citizens to which that opinion especially directs attention as being one of the "inherent rights, natural rights, rights to be freely and independently exercised * * * without any meddling, any hindrance, and any control of the government," is what said opinion denominates "the right of the citizen to associate himself with other citizens in a political party for the advancement of his political beliefs and the influential exercise of his political rights." Is the implied reference to that portion of section 27 of the Bill of Rights which declares that "the citizens shall have the right, in a peaceful manner, to assemble together for their common good"? Presumably so.

[17] But said certified question does not mention or relate to said Bill of Rights, or to any section or clause in it. On the contrary, that question, which alone is before this court for answer, is limited, expressly, to "section 2 of article 6," containing said suffrage clause. The statutory and settled practice in this court has been to confine the answer strictly to the "very question" certified. R. S. art. 1619; Darnell v. Lyon, 85 Tex. 473, 22 S. W. 960; State v. Post, 106 Tex. 468, 169 S. W. 407.

However, if said Bill of Rights is to be considered, how can it be said to impose any restriction upon the power of the Legislature to enact said statute of 1918? Said Bill of Rights does not mention suffrage, nor does it carry any reference to that subject. Indeed, what is often called the "right of suffrage" is not a "natural" or "inherent" or an "inalienable" *right*, but is, essentially, a *privilege*, conferred by a Constitution, or by a statute, or by both. Solon v. State, 54 Tex. Cr. R. 262, 114 S. W. 349; 15 Cyc. 280, and cases cited.

In the very nature of things the right of the citizen to which said dissenting opinion presumably refers is not destroyed or abridged, but, on the contrary, is rendered more effective, by reasonable requirements relating to party fealty as conditions for participation in party assemblies, such as primary elections and primary conventions. Katz v. Fitzgerald, 152 Cal. 433, 93 Pac. 112. Tests of party fealty are essential to party preservation.

[18] Moreover, all of the rights and privileges guaranteed by our Bill of Rights to "citizens" belong, inherently, to women as well as to men. Women are "citizens," within the meaning of our Bill of Rights, although citizenship does not, necessarily, carry the privilege of suffrage. Const. U. S. Amend. 14, § 1; Minor v. Happersett, 21 Wall. (U. S.) 162, 22 L. Ed. 627; 15 Cyc. 298, and cases cited. Men have no monopoly in the constitutional right of assemblage, or in any other right or privilege mentioned in our Bill of Rights. Thus it appears that, if it be assumed that the stated right of assemblage extends to and embraces participation in primary elections and primary conventions, an extention to women of the privilege of voting therein does not deprive men of any right or privilege; it rather makes effective, in a practical way, corresponding constitutional rights of women.

"There having been no constitutional limitation upon the power of the party with respect to the qualifications of its members, it would seem that, if the Legislature has power to legislate on the subject at all, its power also is without limitation, as far as concerns the rights of the individual elector" (to participate in party primaries). Morrow v. Wipf, 22 S. D. 146, 115 N. W. 1121; State v. Nichols, 50 Wash. 508, 97 Pac. 728.

[19] Whether purely party affairs, such as primary elections and primary conventions, should or should not be regulated, and the extent of such regulation, so long as it is reasonable, are peculiarly legislative matters, involving issues of public policy with which courts have no concern. Ledgerwood v. Pitts, 122 Tenn. 571, 125 S. W. 1036, and cases cited; State v. Metcalf, 18 S. D. 393, 100 N. W. 923, 67 L. R. A. 331; De Walt v. Bartley, 146 Pa. 529, 24 Atl. 185, 15 L. R. A. 771, 28 Am. St. Rep. 81; McGrael v. Phelps, 144 Wis. 1, 128 N. W. 1041, 35 L. R. A. (N. S.) 353; People v. Committee, 164 N. Y. 335, 58 N. E. 124, 51 L. R. A. 674; Healey v. Wipf, 22 S. D. 343, 117 N. W. 521; People v. Board, 221 Ill. 9, 77 N. E. 321, 5 Ann. Cas. 568; Riter v. Douglass, 32 Nev. 400, 109 Pac. 444, and cases cited. See, also, Waples v. Marrast, supra; Glasgow v. Terrell, 100 Tex. 584, 102 S. W. 98; State v. Michel, 121 La. 374, 46 South. 430, and cases cited; 9 R. C. L. 1076, and cases cited; 15 Cyc. 332, and cases cited; 91 Am. St. Rep. 477, note. Upon that theory many of the states have enacted direct primary laws.

"The right of the Legislature to require that nominations shall be by primary and to prescribe additional qualifications for the voters participating in same has been recognized by the weight of authority in the states of the Union. Runge v. Anderson, 100 Wis. 533, 76 N. W. 482, 42 L. R. A. 239; State ex rel. McCarthy v. Moore, 87 Minn. 308, 92 N. W. 4, 59 L. R. A. 447, 94 Am. St. Rep. 702; State v. Drexel, 74 Neb. 776, 105 N. W. 174; Hopper v. Stack, 69 N. J. Law, 562, 56 Atl. 1; Coffey v. Dem. Gen. Com., 164 N. Y. 335, 58 N. E. 124; Healey et al. v. Wipf (S. D.) 117 N. W.

521; Griffin v. Gesner, 78 Kan. 669, 97 Pac. 794; Walling v. Lansdon, 15 Idaho, 282, 97 Pac. 396; State v. Nichols, 50 Wash. 508, 97 Pac. 728. * * * An examination of many of these cases has disclosed the fact that they are bottomed on two propositions, namely: (1) That such primaries are not in reality elections, but merely nominating devices; and (2) that they are valuable auxiliaries for the promotion of good government and are regulated by legislative enactment for the public welfare." Ledgerwood v. Pitts, 122 Tenn. 571, 125 S. W. 1036. See, also, McInnis v. Thames, 80 Miss. 617, 32 South. 286; Kenneweg v. Com'rs, 102 Md. 119, 62 Atl. 249.

It follows, upon both principle and authority, that in so far as it may present the view that said statute of 1918 deprives either male voters or political parties of an "inalienable right" said dissenting opinion is erroneous. See, especially, Morrow v. Wipf, Labauve v. Michel, and Riter v. Douglass, all supra; State v. Flaherty, 23 N. D. 324, 136 N. W. 76, 41 L. R. A. (N. S.) 132; Katz v. Fitzgerald, 152 Cal. 433, 93 Pac. 112.

Essential to the very existence and practical operation of any comprehensive and reasonable primary election law is a requirement that all the participants therein shall be of the same political faith, as that only Democrats shall participate in democratic primary elections. But that qualification is not mentioned in said section 2 of article 6 of our Constitution; nor is it within the power of the Legislature to prescribe it, if as is here contended, primary elections are "elections" in contemplation of that section of our Constitution. Consequently, if by reason of their constitutional qualifications, all "electors" may vote in the primary election of any party, they may, for like reason, vote in the primary elections of all parties, which, necessarily, would circumvent the purpose and utterly destroy the usefulness of all primary elections. In other words, if said dissenting opinion is sound, its logical effect is to destroy all primary election and primary convention laws.

[20] The suffrage clause of a Constitution being "restrictive" in its operation, its legal effect is to deprive the Legislature of authority *to take from or to add to* the therein defined qualifications of "electors" in any election to which that clause applies. To that effect are practically all of the authorities. The soundness of that proposition has not been questioned in this case. Consequently, if (as is insisted in said dissenting opinion) said suffrage clause is applicable to primary elections and to primary conventions, the Legislature is as powerless to prescribe an additional qualification for participation therein as it would be to prescribe the same additional qualification for participation in "general elections." In other words, if primary elections and primary conventions are "elections" within the meaning of said suffrage clause, the Legislature is powerless to prescribe additional qualifications, such as party fealty, as a condition to participation therein. There is no middle ground. That principle was asserted and applied in Spier v. Baker, 120 Cal. 370, 52 Pac. 659, 41 L. R. A. 196, wherein it was held that expenses of primary elections validly might be paid out of public funds. Further reference to that case will be made hereinafter.

Under the view that our suffrage clause applies to primary elections and primary conventions as well as to "general elections," every man who is a qualified voter in a general election logically would have a *constitutional* privilege, regardless of party affiliations or party fealty, of voting in every primary election and in every primary convention in his general election precinct. That would render futile all party organization involving the use of primary election or primary convention machinery. In practice it would destroy, utterly, primary elections and primary conventions, since without party fealty they cannot effectuate the purpose of their existence. It was so pointed out in the majority opinion in this case, quoting from Kelso v. Cook, 184 Ind. 173, 110 N. E. 990, Ann. Cas. 1918E, 68. To the same effect are Hamilton v. Davis, State v. Flaherty, and Morrow v. Wipf, all supra, and Riter v. Douglass, 32 Nev. 400, 109 Pac. 444, and many other cases. In Morrow v. Wipf, 22 S. D. 146, 115 N. W. 1121, the court said:

"It is for the party to nominate; for the people to elect. The question is not who shall be chosen to any particular public office. That is for the voters of all political parties to determine at the polls. It is simply who shall represent the organization as its nominees, and certainly the determination of that question should be controlled by the action of the party itself; otherwise, party nominations are impossible."

To prevent party disintegration resulting from participation of adherents of no party, or of another party, in a party primary, has been the declared purpose of primary election statutes in various states. Socialist Party v. Uhl, 155 Cal. 778, 103 Pac. 181. A North Dakota statute making party fealty a condition for participation in a party primary was held valid, as neither prescribing an added franchise requirement nor restricting the right of suffrage, within the meaning of the suffrage clause of the Constitution of that state, wherein males only were declared to be qualified electors. In holding that statute constitutional the Supreme Court said:

"To hold the contrary is to invalidate every primary election statute in toto, deny constitutional recognition of purpose of the election, and apply the constitutional definition of 'elector' and hold that by virtue of being an elector he shall be 'deemed a qualified elector at such election,' and our whole primary election system must fall, because the right to participate de-

pends, not on the elector's constitutional rights so defined alone, but on added qualifications of partisanship." State v. Flaherty, 23 N. D. 313, 136 N. W. 76, 41 L. R. A. (N. S.) 132.

In that case the court said also:

"The primary election statutes have as a principal purpose the regulation of the franchise of electors within party limits. The elections so provided concern primarily the rights of parties, and only incidentally those of the individual elector. The primary is not held to afford an elector as such merely a chance to exercise his right of suffrage, but instead an opportunity to participate in the proceedings and acts of a political party. This he does by exercising his right to vote, but within that party. * * * If he has no party belief whatever, denial of his right to participate in a partisan election does not deny him any right, legally or morally, existing to him merely as an elector. * * * We cannot reasonably conclude these suffrage provisions were intended to so exaggerate the franchise privilege of the individual as to obliterate them or thwart any legislative purpose to perpetuate political parties."

See, also, State v. Nichols, 50 Wash. 508, 97 Pac. 728; Whipple v. Broad, 25 Colo. 407, 55 Pac. 172; Britton v. Board, 129 Cal. 337, 61 Pac. 1115, 51 L. R. A. 115; Schostag v. Cator, 151 Cal. 600, 91 Pac. 502; State v. Johnson, 87 Minn. 221, 91 N. W. 604, 840; Kelso v. Cook, 184 Ind. 173, 110 N. E. 990, Ann. Cas. 1918E, 68.

"The elective franchise guaranteed to the electors under the Constitution of the state is a mere political privilege, not a natural right nor an inherent unqualified personal or political right, and, in consequence, it naturally follows that the rights of political parties are no greater than the rights of the electors derived from the Constitution. 6 Am. & Eng. Ency. p. 935; Bryce, Am. Commonwealth, pp. 422, 423; Weimer v. Bunbury, 30 Mich. 214; 8 Cyc. 743; Cooley, Const. Lims. (7th Ed.) pp. 244, 245; Beebe v. State, 6 Ind. 501–510, 63 Am. Dec. 391; Mayo v. Wilson, 1 N. H. 53; Hale v. Everett, 53 N. H. 9, 16 Am. Rep. 82; Eckerson v. Des Moines, 137 Iowa, 452, 115 N. W. 177; Healey v. Wipf (S. D.) 117 N. W. 521; Coggeshall v. Des Moines, 138 Iowa, 730, 117 N. W. 309, 128 Am. St. Rep. 221; Gougar v. Timberlake, 148 Ind. 38, 46 N. E. 339, 37 L. R. A. 644, 62 Am. St. Rep. 487." Riter v. Douglass, 32 Nev. 400, 109 Pac. 444.

Concerning tests of party fealty, as related to constitutional "electors," the Supreme Court of Louisiana said:

"It is of the very essence of a primary that none should have the right to participate in it but those who are in sympathy with the ideas of the political party by which it is being held. Otherwise the party holding the primary would be at the mercy of its enemies, who could participate for the sole purpose of its destruction, by capturing its machinery or foisting upon it obnoxious candidates or doctrines. * * * If, therefore, there could not be a primary under our Constitution without the admission of outsiders, the consequence would be that under our Con-

stitution such a thing as a primary would be impossible. The argument, therefore, that in a statute-regulated, or compulsory, primary the qualifications of voters cannot be other than as fixed by the Constitution for the general election, would lead to the conclusion that such a primary was a legal impossibility. * * * As expressed by Judge Parker (Coffey v. Dem. Gen. Com. [164 N. Y. 335, 58 N. E. 124, 51 L. R. A. 674]), the idea of such a law is 'to permit the voters to construct the organization from the bottom upwards, instead of from the top downwards,' and it would be strange indeed if the Constitution had made such a scheme impossible." State ex rel. Labauve v. Michel, supra.

"Written Constitutions were adopted, not as a sword against the public interest, but as a shield to protect the public interest, safeguarding the rights of the humblest citizen as well as the highest." Miami County v. City of Dayton, 92 Ohio St. 215, 110 N. E. 730.

Did the makers of the Constitution of Texas contemplate or desire such destruction or impairment of party organizations? If not, they could not have intended that our said suffrage clause should be construed and treated as applicable, alike, in all respects, to "general elections" and to primary elections and primary conventions.

All great writers on the philosophy of government have recognized the importance and practical necessity of political parties in preserving the essential principals of free government. 2 Bryce's Am. Commonwealth, c. 60; Ladd v. Holmes, 40 Or. 167, 66 Pac. 714, 91 Am. St. Rep. 457. Consequently such destruction or derogation of political parties as surely would result from a logical enforcement of the minority view that "election," as employed in our said suffrage clause, embraces primary elections and primary conventions, hardly could have been contemplated or intended by those who wrote and adopted said suffrage clause; and a construction which might result so disastrously to the government and to all the people should not be given, by the Legislature and the courts, to that clause, unless its utter inelasticity so requires. Legislatures and courts, in nearly all instances, all over the United States, have declined to give the word "elections" so broad an interpretation. 15 Cyc. 332, 333.

Furthermore, if said dissenting opinion in this case is sound, if primary elections and primary conventions are, indeed, *in a constitutional sense,* "public elections," elections constituting *a portion of the machinery of government,* and therefore open to all constitutional "electors," the effect of our primary election laws is to fasten upon the people of Texas a system of *double governmental elections,* for, at least, the selection of public officers. If that is what our Constitution really contemplates—if, as declared in the dissenting opinion in the present case, "party primaries are * * * public 'elections,' and are 'elections' in the common, everyday

meaning of the word, and so known and recognized to be by everybody"—why did the author of that opinion declare, in Waples v. Marrast, supra, and why did this court therein unanimously hold, that payment of expenses of statutory primary elections out of public funds is prohibited by our Constitution? Why did it not hold directly to the contrary, as did the Supreme Court of California, upon similar reasoning, in Spier v. Baker, supra? That very contention of the dissenting opinion in the present case was one of the two grounds of that California decision; the other being that their suffrage clause (unlike ours) expressly embraced "all elections which are now or may hereafter be *authorized by law*."

Such a *double system of governmental elections* has, indeed, been expressly adopted by the people in various states (generally in the form of amendments of their state Constitutions); but it seems unreasonable to presume and hold that such was the purpose and intent of the makers of our own Constitution when said suffrage clause was embodied in it.

Then if, in formulating and in adopting said suffrage clause the makers of our Constitution contemplated primary elections and primary conventions at all, they must have assumed that to primary elections and primary conventions said restrictive provisions of said suffrage clause would not apply, or, if they did not therein at all contemplate primary elections and primary conventions, said suffrage clause is not applicable to them. In either event said suffrage clause leaves the Legislature free to prescribe the qualifications of participants in primary elections and in primary conventions, as well as reasonably to regulate them in other respects; wherefore said certified question should be answered negatively.

In said dissenting opinion is much to the effect that our Constitution was intended to be of enduring character, employing language appropriate to that result and intended to meet conditions as they may arise, and that its makers sought therein to restrict the right of suffrage in those elections "at which elective officers of the state were to be determined." With all that everybody agrees, of course. But, by a very easy transition, the dissenting opinion declares that "in this state, in actual result the primary election is the decisive election." When measured in terms of law, in actual governmental consequences cognizable by our state Constitution, that quoted conclusion lays down a proposition which cannot be maintained.

That postulate (which is essential to the support of the conclusion asserted in said dissenting opinion to the effect that primary elections are "public elections") seems, at first blush, quite plausible; but really it is entirely unsound. Otherwise, there would

be no need for a "general election" (for which the Constitution expressly provides); the "decisive" result in the election of elective state officers having been already actually "determined" (according to that view) in party primaries of only the one party to which, alone, as a matter of classification, our general primary election law now applies. The fact is, that, at that juncture, there has been a "nomination," but no "election," to such offices in contemplation of the Constitution. Line v. Board, 154 Mich. 329.[1] No sophistry can change that fact. See majority opinion and authorities therein cited.

However, if, as the argument of our Chief Justice runs, in effect, "the framers of the Constitution and the people of the state in its adoption," in their deep concern for the future, undertook to provide, in that document, "that only those persons having the qualifications named in the Constitution should vote, or be entitled to vote, in the election, regardless of its name or other character, at which elective officers of the state were to be determined," and foresaw "that, save in an election involving change in the state's organic law, that election would be the most vital in the affairs of the state," and foresaw, also, that "the primary elections" were to become "the decisive elections in this state in the choosing of public officers," and that the party primaries of some one political party might and would become "in actual result * * * the decisive election" with which they—our fathers—were undertaking, in our said suffrage clause, to deal, why were not "primary conventions," or "primary elections," as such, expressly provided for, directly or indirectly, or mentioned, in that suffrage clause (section 2, art. 6), or elsewhere in our Constitution? And why was it that, in defining qualifications of electors, our suffrage clause used simply the words "any election," and did not even declare that provision applicable to *any election authorized by law*, as did, *at that time*, suffrage provisions of Constitutions of several states, including California and Iowa? See Spier v. Baker, 120 Cal. 370, 52 Pac. 659, 41 L. R. A. 196; Edmonds v. Banbury, 28 Iowa, 267, 4 Am. Rep. 177; Coggeshall v. Des Moines, 138 Iowa, 730, 117 N. W. 309, 128 Am. St. Rep. 221; Harris v. Burr, 32 Or. 348; Ladd v. Holmes, 40 Or. 167, 66 Pac. 714, 91 Am. St. Rep. 457. See, also, Const. of Minnesota; State v. Johnson, supra. As to the effect of provisions of that nature, concerning "elections," as employed in state Constitutions, see Leonard v. Com., 112 Pa. 607, 4 Atl. 220, cited in said dissenting opinion; Allison v. Blake, 57 N. J. Law, 6, 29 Atl. 417, 25 L. R. A. 480; In re Gage, 141 N. Y. 112, 35 N. E. 1094, 25 L. R. A. 781.

In construing "elections," as used in such a suffrage clause of the Iowa Constitution, the Supreme Court of that state said:

[1] 117 N. W. 730, 18 L. R. A. (N. S.) 412. 16 Ann. Cas. 248.

"Until comparatively recent times the word 'election,' when applied to political subjects, did not denote the choice of a principle, or the decision of a question of government, or the advice to governing bodies by the electors, and only when declared by the instrument itself to be sufficiently comprehensive to cover these matters has it been construed to have this extended meaning." Coggeshall v. Des Moines, supra.

Had such an amplifying or enlarging expression concerning "elections" been inserted originally, in our suffrage clause, as it was, earlier, in the corresponding clauses of Constitutions of other states, there would be some reasonable ground for holding, in the present case, that our suffrage clause extends to and includes "primary elections" (in that they are in a qualified sense "elections," and are "authorized by law"), just as was held in the California case (Spier v. Baker) relied upon by our Chief Justice; and, perhaps, that reasoning, although attenuated, might apply to "primary conventions" also. Was the omission of such an amplifying or enlarging expression (so treated by courts generally) from the suffrage clause of our present Constitution accidental and without meaning, or intentional and fraught with significance? Presumably, the latter. And that presumption is strengthened by the fact that, certainly, that very distinction actively was present in the minds of the framers of that instrument—at least as to votes of "soldiers"—in that the next preceding section of article 6 declares that they "shall not be allowed to vote in this state," although, prior to that time, the inhibition against their voting extended no further than to "any election created by this Constitution." Consts. of Tex. 1845, art. 3, § 1; 1861, art. 3, § 2; 1866, art. 3, § 1; 1869, art. 3, § 1.

Contemporaneously with the adoption of our suffrage clause there was placed in the judiciary article (article 5) an enlargement clause, extending the judicial power of the state to "such other courts as may be established by law," as well as to the courts therein enumerated.

[21] It is to be presumed that provisions of then existing Constitutions of other states, so extending the meaning of the word "elections," as used in Constitutions, as to make the provision expressly include all elections then or thereafter "authorized by law" (whether strictly governmental elections or not)—when such enlarged meaning was intended—were known to the makers of our own Constitution. Under such circumstances, and according to the last hereinabove cited line of decisions, if weight is to be ascribed to them, the very omission from our suffrage clause of any and all such words of expansion or enlargement of the usual governmental and legal office of the word "election" fairly implies that an unrestricted meaning or legal operation of that word was not therein contemplated. This phase of our Constitution,

as compared with those of various other states, is mentioned herein both as a basis of appraisement of the value, in this case, of cited decisions of those states, and by way of showing that from whatever viewpoint the present issue is considered the same general conclusion as to the validity of said statute of 1918 results.

Said dissenting opinion cites, in its support, on the main issue, the following cases from other states, but does not point out the difference between the Constitutions under which they arose and our own Constitution: (a) Leonard v. Commonwealth, 112 Pa. 607, 4 Atl. 220. Unlike the present case, that case involved neither the construction of the suffrage clause of a Constitution nor the validity of a statute. Their Constitution denounced "bribery, fraud, or willful violation of any election law" by any candidate for office, prescribing as a punishment absolute disqualification to hold office, and prescribing forfeiture of the right of suffrage for four years, as punishment for "any person convicted of willful violation of the election laws." Under said provisions, and a statute of 1881, which the caption and the court declared was designed to prevent bribery and fraud at primary elections and at nominating conventions, one section of which denounced bribery by a candidate for office in securing his nomination and prescribed penalties of fine and imprisonment only, Leonard was ousted from office; the first penalty prescribed by the Constitution, but not by the statute, being enforced against him. Thus the controlling question on his appeal was whether said first constitutional penalty was applicable to his case; or, in other words, whether said primary election and nominating convention statute was an "election law" within the meaning of said provisions of their Constitution. The upper court decided that question affirmatively, upholding said judgment. But its supporting argument was to this effect: First, the statute, being "complete within itself"—"a perfect law so far as its validity depends upon mere form"—and there being in the Constitution nothing to forbid its enactment, it should be treated as a "law"; second, inasmuch as it was one relating to "elections" according to the "common and popular use of words," it should be treated as an "election law"; and, third, inasmuch as said provisions of their Constitution were remedial in their nature, and the object aimed at by them and by the statute was the purification of that which had "become a part of our great political system," of important relation to the general election, said provisions "must receive a liberal construction," and must be "interpreted so as to carry out the great principles of government, not to defeat them"; wherefore said statute must be held to be "an election law" within the meaning of said provisions of their Constitution. As a supporting argument the court added this:

"Moreover, the relation of nominating conventions to the general election, and the importance of that relation, is *recognized by the Constitution itself*. This is notably so in article 7, which prescribes the oath of office, and which requires all Senators and Representatives, and all judicial, state, and county officers, to swear that 'I have not paid or contributed, or promised to pay or contribute, either directly or indirectly, any money or other valuable thing to procure my *nomination* or election.'"

[22] Neither in prescribing the oath of office, nor elsewhere, does our Constitution place "nominations" in the same category with "elections" or in any wise refer to nomination of candidates for office. That decision, and the reasoning of the court thereon, are in accord with the liberal rule generally applied in the construction and enforcement of remedial provisions of statutes and of Constitutions. Ashford v. Goodwin, 103 Tex. 491, 131 S. W. 535, Ann. Cas. 1915A, 699; Anderson v. Ashe, 62 Tex. Civ. App. 262, 130 S. W. 1044; Allison v. State, 45 Tex. Cr. R. 596, 78 S. W. 1065; Schostag v. Cator, 151 Cal. 600, 91 Pac. 502.

But, just as generally, a stricter rule is applied when (as in the present case) the question before the court is as to the restrictive effect, upon legislative power, of provisions of a state Constitution. In that case, under those circumstances, as the court there declared, it was fair to assume that the words "any election law," as used in said remedial provisions of their Constitution, were meant to embrace "any law relating to elections" (whether strictly "governmental'" elections or not); but from that it does not follow, logically, that "election," as used in the suffrage clause of our Constitution (which imposes, as everybody concedes, restriction upon legislative authority), was intended to include purely party primaries. That material distinction between the widely different purposes and functions of said provisions of the Pennsylvania Constitution and those of our own suffrage clause seems to have been ignored in the dissenting opinion in the present case.

However, substantially that same distinction was not ignored, but was recognized and emphasized, by that court in that Leonard Case, in expressly reaffirming its own earlier hereinabove cited decision in Commonwealth v. Wells, 110 Pa. 463, 1 Atl. 310, wherein, quite recently, it had held that betting on a "primary election" was not a violation of a statute denouncing "wagering or betting on the event of an election held under the Constitution or laws of the United States or the Constitution and laws of this commonwealth." (Note, in the context, the reference to an election *in contemplation of their Constitution.)* Commenting, in the Leonard Case, upon said earlier decision (which dealt with an act of 1817, as amended in 1839), that court said:

"All this is very plain. When the acts referred to prohibit and punish the betting on elections, they manifestly mean elections when some one is elected to a public office; not to elections when delegates are to be chosen to nominating conventions. We reaffirm this ruling in all its fullness. But does it apply to the case in hand?" (That earlier case had been cited as controlling the latter case.)

The earlier case is much more like this case. It should be remembered that both of those Pennsylvania decisions were by the same seven justices, comprising what our Chief Justice justly calls "a strong and learned court as can be found." Themselves being judges, "elections" in the suffrage clause of our Constitution would not be held to include party primaries. Aside from certain choice rhetoric in the Leonard Case announcing certain indisputable general conclusions on construction of Constitutions, it is difficult to see how that case affords any substantial support for said dissenting opinion. As between that case and Waples v. Marrast, is not the latter much more applicable, with controlling force, in answering said certified question? As quoted by our Chief Justice, that Pennsylvania opinion declared:

"We may safely assume that the words in a statute or a Constitution are used in the sense in which the people who made the statute or Constitution understood them."

Precisely so; and in the present case extensive, but unsucessful, research has been made to discover why (if at all) this court should hold that "election" in our suffrage clause was used, by its makers, in a sense so strikingly different from that in which it has been used in Constitutions of so many other states.

(b) People ex rel. Breckon v. Board of Election Com'rs, 221 Ill. 9, 77 N. E. 321, 5 Ann. Cas. 562 (decided in 1906); Rouse v. Thompson, 228 Ill. 522, 81 N. E. 1109 (decided in 1907); and People v. Strassheim, 240 Ill. 279, 88 N. E. 821, 22 L. R. A. (N. S.) 1135 (decided in 1909).

The decision in the Breckon Case was to the effect that primary elections are elections in contemplation of that clause of the Bill of Rights of the Constitution of Illinois which provides that "all elections shall be free and equal" (section 18), and that, consequently, a primary election law which regulates the form of the ballot, what shall appear thereon, and how the candidates must be chosen, must *not violate that provision.* Said provision does not appear in our Constitution. The court said:

"The Legislature may and ought to provide all such reasonable regulations as will make the provision of the Constitution effectual, and guard against fraud, undue influence, or oppression, and preserve the equal rights of all from interference or encroachment."

Accordingly the court held void certain provisions of the Act of 1905, (Laws 1905, p. 211), among them being one prescribing, as to candidates for certain offices, restrictions in addition to those prescribed by the Constitution, and one requiring candidates to pay certain filing fees, in fixed amounts bearing "no relation to the services rendered in filing the papers or the expenses of the election." Other features of that decision are unimportant here. That case did not involve construction of a suffrage clause and did not expressly involve restricted woman's suffrage. In Kentucky, and in Tennessee, and in Indiana, as hereinabove shown, that provision in a Constitution has been held inapplicable to primary elections.

In the Rouse Case it was held that the provision in the primary election statute of 1906 authorizing the managing committee of a political party to nominate candidates in ("special elections") to fill vacancies in elective offices was violative of said provision that "all elections shall be free and equal." Therein it was held, also, that said primary law interfered with the voter's constitutional right to cast as many votes for one candidate as there were representatives to be elected, and, in that far, was void. And therein it was held, also, that certain provisions of the statute concerning registration were void, because conflicting with a provision of the Constitution on that subject, which, it was declared, "applies to a primary election with the same force that it does to a general election." There was a vigorous dissenting opinion by Judge Carter. That case involved neither restricted woman's suffrage nor the construction of a suffrage clause. It is interesting to note that therein the right of the Legislature reasonably to regulate primary elections is upheld, and the absolute necessity for tests of party fealty is recognized, in view of the fact, there mentioned, that otherwise "the whole scheme of nominating party candidates by a primary election would fail, because of being incapable of execution." The court said, also:

"What regulations should be had to secure fair primary elections must rest largely with the Legislature, and the courts should not override the discretion placed in that branch of the government by the Constitution, unless it clearly appears that the constitutional rights of the individual voter have been infringed upon."

In the Strassheim Case, which declaredly followed the doctrine of said two cited earlier Illinois cases, the primary election law of 1908 was held void on the ground that it undertook to deprive some electors possessing the constitutional qualifications of the right to vote at primary elections, and to add to such qualifications. The case involved only questions relating to residence, naturalization, and registration. The concurring opinion by Judge Carter indicated his view

that he was bound by that court's former decisions.

Putting the matter most strongly against the decision of this court in this case, it may be conceded that, according to the views of the Supreme Court of Illinois, as to all candidates to be nominated thereat for *offices provided for by their Constitution,* a primary election is an "election" in contemplation of their suffrage clause. But, even in that state (as pointed out in the majority opinion in the present case), the restrictive provisions of their suffrage clause is held inapplicable to either nominations, in party primaries, of candidates for *purely statutory offices,* or to other *purely statutory elections.* Accordingly an Illinois statute conferring upon women the privilege of suffrage, *to that extent,* was upheld by that court as valid. Scown v. Czarnecki, 264 Ill. 305, 106 N. E. 276, L. R. A. 1915B, 247, Ann. Cas. 1915A, 772, decided in 1914, seems to be the latest Illinois decision on the subject.

Upon the whole, the three Illinois cases cited in said dissenting opinion do lend it some support; but they are contrary to the great weight of authority.

(c) Spier v. Baker, 120 Cal. 370, 52 Pac. 659, 41 L. R. A. 196 (decided in 1898). That is the California decision which was declared by the Supreme Court of Tennessee to be "opposed to the great weight of authority." Ledgerwood v. Pitts, 122 Tenn. 570, 125 S. W. 1036. With reference to it the same court said:

"California is one of the few states which hold that a compulsory primary law forms a part of the general election laws of the state and is governed by all constitutional limitations in regard to the right of suffrage."

An earlier decision of California had declared a primary election an election referred to in their Constitution. Marsh v. Hanly, 111 Cal. 368, 43 Pac. 975 (decided in 1896). The suffrage clause of the Constitution of California restricted to males the right to vote "at all elections which are now or may hereafter be authorized by law." Article 2, § 1. Concerning primary elections the court said:

"In other words, the Legislature, believing a sound public policy demanded such a course, has made these elections *a state institution.* By the whole tenor of the act they are placed upon the plane of *state elections* and in the consideration of the law bearing upon them they must be so recognized."

The words following "elections" (which are not in our suffrage clause) were treated as manifesting a deliberate purpose, on the part of the people of California, expressly to extend the provisions of their suffrage clause defining electors far beyond mere balloting, in the general election, for officers provided in the Constitution, and even beyond ballot-

ing on strictly governmental matters, and to make such suffrage clause applicable, unquestionably, to all "public" elections then or thereafter "authorized by law." The decision in Spier v. Baker proceeds, declaredly, upon the view that under the language of their suffrage clause, and the legislation of that state concerning primary elections, such elections are not only "governmental elections" in the full sense of that term, but are, as well, "elections" in contemplation of their Constitution (citing Marsh v. Hanly, supra). But for that fact, the court declared, the Legislature would have been destitute of authority to provide, as it had done, for payment of primary election expenses out of state and county revenues derived from taxation; their Constitution containing (as does ours) prohibitions against application of such funds to private uses.

Upon the view that primary elections were within the scope of the quoted language of their Constitution, and consequently were "state elections," that court did declare, with reference to their suffrage clause:

"These things being true, the Legislature has no power to deprive any citizen of this state, who fills all the requirements demanded by the section of the Constitution quoted, from voting at an election provided for by this act."

Accordingly the primary election act of 1897 (which the court called "the first of its kind") was held void because it undertook to restrict, in certain respects, the privilege of suffrage as defined in their suffrage clause, and for other reasons not material here. The difference between their suffrage clause and our suffrage clause is obvious, in that ours does not expressly refer to all elections authorized or to be authorized by law. The legal effect, if any, of the added words in the suffrage clause of that state, need not now be determined. The very fact that they were therein, and were made, by that court, a basis of its decision in Spier v. Baker, is sufficient to break, if not entirely to destroy, the force of that decision as an authority in the present case. But, if said difference between their Constitution and ours is to be ignored, and that California decision is to be considered both sound and fairly applicable to primary election statutes of Texas (all as indicated in said dissenting opinion by our Chief Justice), the logical and necessary legal consequence will be affirmation *in principle* of the constitutionality of our said abovementioned unrepealed presidential primary election statute of 1913, which undertook to authorize payment of primary election expenses out of public funds (and which this court held void in Waples v. Marrast, supra), thereby impliedly *overruling his own opinion in that case*. Preferably, the decision in Waples v. Marrast should stand. But, certainly, it and said dissenting opinion are mutually destructive.

Let the test defined in Spier v. Baker be applied here. If, as therein decided, primary elections are "state elections," and if, as now declared by our Chief Justice, primary elections are (equivalently) "public elections," and are peculiarly "elections" to which our fathers intended the restrictive qualifications set forth in our suffrage clause to apply (in that, according to his averments, "in this state, in actual result, the primary election is the decisive election"), there appears to be, indeed, no sound reason why expenses of such elections may not validly be paid out of public funds. Conversely, if (as this court held in Waples v. Marrast) payment of expenses of primary elections out of public funds is inhibited by two sections of our Constitution (because they are mere political party affairs, and not "governmental," nor truly "public" or "state," elections), is it unreasonable to conclude, as did our Legislature when it enacted said statute of 1918, to which the certified question refers, that they are not (as are "general elections" and "special elections") the "elections" which were the objects of the anxious solicitude of our fathers in framing and in adopting said suffrage clause? And is there not even room for "a reasonable doubt" on that point, which, if it exists, will itself (as our Chief Justice admits) properly support the validity of that statute?

The California case of People v. Cavanaugh, 112 Cal. 674, 44 Pac. 1057 (decided in 1896), discloses the view of primary elections which the Supreme Court of that state entertained prior to the legislation which later (in Spier v. Baker) it declared constituted them, substantially, "state elections." In that earlier case, in holding that section 19 of the Purity of Elections Act of 1893 (St. 1893, p. 22) did not apply to primary elections for delegates to a political convention, that court said:

"Defendant was charged with attempting, by the use of money to influence an election of certain delegates at a Republican primary election. It is now claimed that the Purity of Elections Act does not apply to primary elections, and this court is in accord with such contention. A primary election is purely a creation of political parties and associations. * * * In the body of this act may be found the word 'election' a hundred times or more, and it may be said in every instance that it is plainly apparent that the word is *not used as applying to primary elections*."

And in California, in 1912, after said decision in Spier v. Baker, and even after the adoption, meanwhile, in 1908, of an amendment of their Constitution (article 2, § 2½) expressly declaring that "the Legislature shall enact laws providing for the direct nomination of candidates for public office, by electors, political parties, or organizations of electors without conventions, at elections to be known and designated as primary elec-

tions" (article 2, § 2½; Socialist Party v. Uhl, 155 Cal. 776, 103 Pac. 181), and under a statute providing that if the petition for a local option election be certified within 6 months and not less than 40 days before "the next general state or general municipal election within the territory described, such question shall be submitted at said general election; otherwise a special election shall be held for such purpose within not less than thirty or more than sixty days after the petition has been certified," it was held that, although the time for holding primary elections throughout the state was fixed by law, such general primary election was not a "general election" within the meaning of said local option statute. Bigelow v. Board of Supervisors, 18 Cal. App. 715, 124 Pac. 554.

Ought said Texas statute of 1918 to be stricken down as unconstitutional on the alleged applicability and strength of the Pennsylvania, Illinois, and California decisions?

Said dissenting opinion in the present case declares that Ashford v. Goodwin, 103 Tex. 491, 131 S. W. 535, Ann. Cas. 1913A, 699, by this court, "settles this question and settles it beyond any doubt," and that Anderson v. Ashe, 62 Tex. Civ. App. 262, 130 S. W. 1044, by our Court of Civil Appeals at Galveston, "is equally conclusive." Those decisions were not so regarded or treated by the same Court of Civil Appeals when later it certified said question to this court; nor by the Court of Civil Appeals at Austin when, prior to this court's decision in this case, that court, in Hamilton v. Davis, supra, decided the same question just as this court decided it, upholding said statute of 1918. They were not so treated or regarded by this court on the original hearing of this case. On the contrary, in Hamilton v. Davis, and by this court in this case, they were treated, briefly, as not conflicting with the view that said primary election statute of 1918 is valid. It was not thought necessary to discuss those decisions more fully in the original opinion of this court in this case, which was prepared before said dissenting opinion therein was completed; but, in view of the construction which our Chief Justice has placed upon them, and the emphasis with which he insists that they conclusively support his conclusion that said statute is unconstitutional, further analysis of and comment upon those decisions, herein is deemed appropriate.

The Ashford Case and the Anderson Case, which were to the same effect, alike involved, concretely, no question as to whether the statutory plan for additions to municipal territory does or does not provide for an election at which all votes are required, by the suffrage article of our Constitution, to be cast "by ballot," as did Graham v. Greenville and State v. Waxahachie, supra; no question as to whether primary elections are public "elections," expenses of which validly may be

defrayed from public funds, as did Waples v. Marrast, supra; and no question as to the power of the Legislature to prohibit a political party from excluding women from its primaries solely because of their sex, as does the present case. Upon what principle, then, can it fairly be said that those two cases, upon which our Chief Justice relies, control the present case?

Ashford v. Goodwin turned upon an issue as to the jurisdiction of a court; this case must turn upon a question of suffrage. That case involved the construction of a word inserted in an amendment, made in 1891, of an article on a particular subject; this case involves the construction of a word used in 1876, in the original form of a different article, on a different subject. It is true that in each instance the word is one the meaning of which is involved in this case; but that circumstance is unproductive, unless along with it goes the assumption that, in all instances, and regardless of the context, a given word means the same thing in every instance in which it is used in the same Constitution. And that is the very assumption upon which our Chief Justice and counsel for the tax collector base their insistence that Ashford v. Goodwin should control the answer to said certified question. But the unsoundness of that assumption is evident in the light of universally accepted canons of constitutional construction and of various decisions of this court. The assumption that "election" in our suffrage clause means just what this court has declared it means in said jurisdictional clause (section 8) of our judiciary article is not maintainable, except upon the untenable hypothesis that in each of those articles the purpose of that word is the same; but, very clearly, they are not the same. The purpose and function of "election," in said suffrage clause, is restricted, solely, to a definition of qualifications of constitutional electors; whereas the purpose and function of "elections" in said amendment of our judiciary article (article 5) is restricted solely to a definition of jurisdiction of district courts. In article 5 "elections" is used in a *remedial* sense, requiring a liberal construction; in our suffrage clause (article 6) its use is restrictive of general legislative power; which fact renders the rule of liberal construction inapplicable.

The Ashford Case arose, not under article 6 of our Constitution, relating to "suffrage" (as did the present case), but under article 5 thereof, relating to the "Judicial Department," and, more particularly, under a section thereof (section 8) which deals solely with the *jurisdiction and powers of district courts* and judges thereof. Very plainly the main function and purpose of that section of said judiciary article was something entirely separate and distinct from dealing with *qualifications for suffrage,* or with "elections" in relation to *who may vote therein,* or in

relation to whether the voting shall be "by ballot" or otherwise.

The provision in section 8, by which district courts were empowered and required to take jurisdiction of and try "contested elections," was "remedial" only, in conception, in expression, and in legal effect. It is part of the public history of this state that the words "contested elections" were inserted, for the first time, in said judiciary article, in 1891, by amendment by the people at the ballot box, not to change the meaning of "election," as already embodied in the suffrage article, defining qualifications of voters, but for the express purpose of giving, for the first time, to district courts indisputable authority to try contested election cases. As declared by this court in the Ashford Case:

"Prior to the adoption in 1891 of the amendment to article 5 of the Constitution of this state, the Legislature could not confer upon the district courts authority to try contested elections. To remedy that defect section 8 of the amendment of article 5 was adopted."

And thereupon, in the Ashford Case, this court upheld the validity of a statutory provision placing within the original jurisdiction of district courts "contests" of primary elections. Viewing that decision even broadly, there is in it nothing clearly decisive, one way or another, of the certified question in the present case; and, when the opinion is examined closely, it is perfectly clear that of the two principles which declaredly controlled the decision in the Ashford Case only one can be applied, in any way, to said certified question; and neither of those principles was declared to be, in any sense or to any extent, the basis for the conclusion of our Chief Justice that said statute of 1918 is unconstitutional.

The one of those principles which is applicable to the present case is that it is the duty of this court to hold a statute *constitutional* "unless its invalidity be apparent beyond a reasonable doubt." That certainly was the main, as well as the first, ground of the decision in Ashford v. Goodwin. That principle was held sound, by the majority opinion in the present case, and formed an independent, but not the main, ground for the decision in this case. That principle is declared by said dissenting opinion to be correct, abstractly, but *inapplicable to the present case.* Why is it not applicable?

[23] The second and only other principle upon which this court rested its decision in the Ashford Case was that said provision of section 8, conferring upon the district court authority to try "contested elections," and the corresponding provision of the act of 1909, putting that quoted clause of the judiciary article into operation, were "remedial" in their nature, and, for that reason, ought to be construed "liberally," in order that such

221 S.W.—58

suits might be tried out in the district court. That principle is wholly inapplicable to the present case, in that the provision of our Constitution here directly involved is not, in any *legal* sense, "remedial." Where the reason for a rule of constitutional construction fails, there exists no occasion for application of the rule.

In support of that second controlling principle, this court, in Ashford v. Goodwin, cited and relied upon a noted Indiana case, State v. Hirsch, hereinabove mentioned, wherein a statute against the sale of liquor on "any election day" was held applicable to a primary election. The "remedial" purpose was to secure *purity in elections.* In that respect the decision in Ashford v. Goodwin was strikingly like that in the Pennsylvania case of Leonard v. Commonwealth, relied upon by our Chief Justice, and discussed hereinabove. The well-settled rule in such matters is that a "liberal" construction should be given to "remedial" provisions of a Constitution or statute, in order to effectuate its general purpose. But in reason, and under the authorities, that rule is not fairly applicable where (as in the present case) the effect would be *to impose limitations upon general legislative authority.* That distinction (which said dissenting opinion ignores) is of grave importance in governmental affairs.

The mainspring in the decision by the Indiana court in the Hirsch Case is found in its quotation from a distinguished law writer (Endlich on Interpretation, § 337), defining the above-stated "liberal" rule of construction of "remedial" statutes. In the Ashford Case, in citing and following the Hirsch Case, this court declaredly treated that rule of construction as being properly applicable to "remedial" provisions of Constitutions also, such as was the clause "contested elections" in article 5. The remedial effect of those words, *in that context,* is manifest in view of the fact that, prior to the amendment by which they were inserted there, "contested election cases" (even when growing out of a "general election" provided for by the Constitution itself) had been declared by this court to be so far merely "political" (not partisan) in nature as to be matters not proper for judicial cognizance, and not within the then existing jurisdiction of the district courts. Gibson v. Templeton, 62 Tex. 555, and cases therein cited.

Constitutional provisions conferring jurisdiction on courts of general jurisdiction are always construed liberally, to avoid leaving the judicial system without a tribunal competent to take jurisdiction in matters of legislative enactment. State v. De Gress, 53 Tex. 387. In that case this court said:

"The clauses of the Constitution defining the jurisdiction of the district court should be liberally construed, with due regard to the fact that on this court, as the 'great reservoir' of juris-

diction, has heretofore devolved the body of litigation in this state. Especially may a narrow and literal construction be rejected, when the result is to leave no tribunal competent to take jurisdiction of ·important cases arising under legislative enactments."

As aptly quoted in Hamilton v. Davis, supra:

"It does not follow, either logically or grammatically, that, because a word is found in one sense in one connection in a Constitution, therefore the same sense is to be adopted in every other connection in which it occurs." Story on Constitution, § 454.

But (said dissenting opinion in the present case inquires) "is the same simple word in a Constitution * * * to be broadly interpreted as found in one provision and narrowly interpreted as found in another provision? * * * If so, has it any certainty of meaning anywhere in the instrument? * * * This is more true of the words of a Constitution, particularly the words of the most familiar character, as the word 'election' is."

To that inquiry a specific and complete answer lies in the recent case of Aransas County v. Pasture Co., 108 Tex. 218, 191 S. W. 553; the opinion of this court therein being by the author of the dissenting opinion in the present case. In that earlier case the word "roads," as found in an amendment of our Constitution (section 52, art. 3), was given a broader and more liberal meaning than had been ascribed to the same word in other articles thereof, because as our present Chief Justice there declared, "the purpose of the amendment was a broad one, its scope was large, its spirit liberal." Is not as much true of said amendment of article 5, concerning "contested elections"? But such amendments are not intended, and are never held, to change the meaning of the same word in another article, dealing with a different subject-matter, or an entirely different phase of even the same subject-matter. In this instance, without conflict, each may have its full contemplated effect.

In the Ashford Case the court did say:

"The language used in the Constitution, 'contested elections,' is broad enough to justify the construction placed upon it by the Legislature, and, there being nothing in the Constitution which limits the meaning of the words used, the Legislature did not exceed its authority in the enactment of the statute."

However, as that opinon discloses, said declaration therein to the effect that the phrase "contested elections" is broad enough, *if taken literally*, to include contests of primary elections, was in the nature of a predicate to support the application which this court there made of the hereinabove stated principle of "reasonable doubt," under which principle this court there held the statute then before it valid.

But the expression, "there being nothing in the Constitution which limits the meaning of the words used," is now italicized by our Chief Justice as having been especially significant in that case, and as now furnishing effective support for his own dissenting opinion in this case. In weighing that remark in that case, and in appraising its value as applied to the certified question in this case, it must be remembered that this case deals directly with a clause of article 6, which entire article relates to "suffrage" only; whereas that case dealt directly with a clause of article 5, which article relates solely to the jurisdiction of the district court. For aught that appeared in Ashford v. Goodwin, there might be in the Constitution several things which either expressly or impliedly "limit," or materially affect, the historical meaning of "elections," as that word is used in the suffrage provisions of section 2, article 6, which do not limit or affect the entirely different historical meaning of "contested elections," as used in the purely jurisdictional provisions of section 8, article 5. However, that possibility is denied in the statement of our Chief Justice that "neither is there anything in the Constitution which limits the meaning of the term 'election' as used in section 2 of article 6"—the suffrage clause. But how about those hereinabove mentioned provisions of our Constitution (section 3, art. 8, and section 52, art. 3), inhibiting the use of public funds for any other than "public purposes," which, as hereinabove stated, the author of that denial declared (in Waples v. Marrast, supra), prohibit the use of such funds in payment of expenses of *primary* "elections," although, as expressly and very carefully there declared by him, expenses of *general* "elections" may be paid out of public funds? See, also, Beene v. Waples, supra.

Do not sections 3 and 52, as so construed heretofore by those two unanimous decisions of this court (and, for that matter, on their intrinsic and unambiguous meaning, aside from decisions), operate as a limitation upon the meaning which the Legislature is authorized to ascribe to the word "election" as used in our suffrage clause, "section 2 of article 6," as, for instance, when applied, not to general elections, or other governmental elections, but solely to purely party affairs? If not—if "election" as used in section 2 of article 6, really "means, steadily and unfailingly, * * * all public elections in the state which the Legislature has power to establish and which it may provide by law" (as now declared by our Chief Justice)—the decision in Waples v. Marrast ought to have been diametrically opposite to what it was, and the Presidential Primary Election Act of 1913 there held void is, legally, in force to-day.

Once before, in Hammond v. Ashe, 103 Tex. 503, 131 S. W. 539, too much was claimed as the intended legal effect of said decision in

Ashford v. Goodwin, which had been decided just two weeks earlier. In that instance the same court which had rendered said earlier decision declared that it was not authority for the proposition that section 10 of our judiciary article (article 5), guaranteeing the right of "trial by jury" in "all causes in the district court," was applicable to "contests of primary elections," although, in that earlier case, it had been held that such contests were within the original jurisdiction of that court pursuant to section 8 of that same article 5 as amended in 1891. The effect of those two practically contemporaneous decisions was to hold one section of that article applicable, and another section of that same article inapplicable, to contests of "elections." In each instance the election happened to be a primary election. Much less is said decision in Ashford v. Goodwin of controlling force in determining what meaning should be attributed to a word as used in the original and many years earlier draft of an entirely different article dealing with a distinctly different subject-matter, to wit, "suffrage," instead of *jurisdiction of courts*.

In view of what has been said hereinabove, it must be too clear for doubt that there is no real conflict between the decision in this case and the decision in Ashford v. Goodwin. But, if such conflict does exist (as insisted by our Chief Justice), the decision in the present case has at least the merit of following the latest prior decision of this court directly involving the determinative principle, to wit, Waples v. Marrast, supra.

Is it not barely possible that (as the original majority opinion in the present case assumed) the different provisions of our Constitution which were involved, respectively, in Graham v. Greenville, Ashford v. Goodwin, and Waples v. Marrast, all supra, and the present case, are all harmonious with one another, as are the decisions in all those cases, and that the only discordant note, throughout, in decisions of appellate courts in Texas, is that which is sounded in said dissenting opinion in this case?

As to Anderson v. Ashe, it simply followed Ashford v. Goodwin. However, in preparing the opinion of the Court of Civil Appeals in that Anderson Case, Chief Justice Pleasants (who certified to this court the question in the present case), with true judicial discernment and caution, expressly and very carefully limited in 1910 that decision of his court to a construction of the word " 'election' as used in the section of our Constitution above quoted"—which was section 8 of article 5, providing a remedy in court theretofore denied, and not section 2 of article 6, prescribing qualifications for voters. Was there in 1910 in the minds of the members of his court, then including, also, Associate Justices Reese and McMeans, the stated question which the Chief Justice of that court has certified to this court for answer? Even then they seemed to be impressed with the idea that, inasmuch as the word "elections" in those separate articles of our Constitution (5 and 6) were inserted therein, respectively, at different times, and for radically different purposes, they fairly might carry somewhat different shades of meaning, aptly corresponding to the essentially different functions which, respectively, they were designed to perform. Aransas County v. Coleman-Fulton Pasture Co., supra; Kelso v. Cook, 184 Ind. 173, 110 N. E. 987, Ann. Cas. 1918E, 68; School Dist. v. State, 173 S. W. 525; Schostag v. Cator, 151 Cal. 600, 91 Pac. 502.

The dissenting opinion laments the consequences of the decision in the present case. That dissenting opinion, if made operative, would strike down said statute of 1918, would uphold, as valid, the Act of 1913 providing for payment of expenses of certain primary elections out of public funds derived from taxation, and would open the doors of all party primaries to all who are entitled to vote in general elections, thereby destroying party organization and party usefulness in preserving clean and efficient government. The decision itself is one which leaves in force an enactment of a co-ordinate department of the government, forbidding, in purely party affairs, exclusive discrimination against women solely on account of their sex, which leaves unimpaired the former decisions of this court denying that public funds may be used to defray expenses of party primaries, and which restricts to adherents of that particular party participation in party primaries, thereby preserving the integrity of party organization and its benefits to the civic life of the commonwealth.

The dissenting opinion, in the construction of said article 6 (which deals exclusively with suffrage), would apply to section 2 thereof, here under review (which prescribes *qualifications* of voters in all elections with which that entire article was intended to deal), a construction conflicting materially, in principle, with the construction which this court repeatedly has applied to said section 4 of that article (which prescribes the *manner* in which such electors shall vote).

Moreover, the dissenting opinion would apply to "election" in said suffrage clause of article 6 a construction wholly inconsistent with section 52 of article 3 and section 3 of article 8 of our Constitution concerning expenditure of public funds. In those two last-mentioned respects the dissenting opinion is squarely in contravention of the well-settled rule of construction that, if possible, any written instrument should be so construed as that every part thereof may stand and perform its own proper function and conserve its own particular purpose. But the decision of this court in this case in-

volves and presents no conflict whatever between different articles of different sections of our Constitution.

The dissenting opinion would overturn said earlier unanimous opinions of this court in Graham v. Greenville, in State v. Waxahachie, in Waples v. Marrast, and in Beene v. Waples; the decision itself is in perfect harmony with each of them, and not in conflict with any decision of this court.

The dissenting opinion conflicts, irreconcilably, with the decisions of nearly all courts of last resort in the United States which have passed upon the issue here presented; the decision itself agrees with them, applying, in the present case, the here pertinent and controlling principle.

The printed argument in support of said motion for a rehearing presents the view that, broadly, from a governmental standpoint, and inasmuch as women cannot vote in general elections, they should not be permitted to vote in even party primaries. Whatever might be the weight of such arguments in the estimation of the Legislature, they cannot be considered here, because they do not affect the one purely legal issue which said certified question presents.

Much of the force of the argument for the tax collector has been spent on the contention that, inasmuch as the nomination in a Democratic primary in Texas is practically equivalent to a final election, the extension to women of the privilege of suffrage in primary elections is tantamount, in law, to giving women the right of suffrage in the general elections and in the special elections provided by our Constitution. If that contention were sound, it would reduce the argument of counsel for appellee, on the main issue before us, to the extremity of saying that, whenever the Democratic nomination shall be equivalent practically to an election, such primary election law will be unconstitutional and void, but, whenever the Democratic party and some other party shall become about evenly balanced, rendering such a nomination no longer equivalent in practice to an election, such primary election law will be constitutional and valid. Under that view the constitutionality of the statute here now in question is made to depend upon whether a nomination in the primaries is or is not practically equivalent to an election. Thereby the constitutionality of said statute is made to depend, from time to time, upon purely fortuitous circumstances, which is absurd.

Treating the required statutory pledge to "support the nominees of this primary" (R. S. art. 3096) as a *legally* binding obligation to *vote* for them in the "general election," counsel for the tax collector contend, substantially, that inasmuch as our suffrage clause concededly prohibits women from voting in the general election, and inasmuch as the result of the general election is practically controlled by the result of the primary elections, the statute of 1918, which permits women to vote in party primaries, should be held invalid. The impelling idea seems to be that the general election law and the primary election laws are statutes in pari materia, and for that reason should be construed together, and that, when so construed, the requirement in the earlier general primary election law that the participant in the primary shall be there pledged to "support" the nominees, shows conclusively that the Legislature, in enacting the general primary election law, contemplated that no one other than a qualified voter in the general election shall be permitted to vote in a primary election, and that said provision should have controlling effect, rendering said statute of 1918 practically inoperative and invalid. And therewith is coupled the suggestion of conflict between the statutory requirement that every voter in a primary election shall take such pledge of party fealty, and the statutory provision for punishment for voting in a primary election by one who is not qualified to vote in a general election.

As a whole, and in every part, that argument falls short of the single issue presented here by said certified question. In the first place (and as pointed out in the original opinion of this court in this case), freely conceding the moral effect of participation in party primaries, including such pledge of party fealty, such participation has, very clearly, no *legal* effect whatsoever upon the status of an elector or voter in a "general election," or upon the ballot of such voter cast therein in open contravention of such primary election obligation.

In discussing the party pledge required by the North Dakota Primary Election Law of 1907, the Supreme Court of that state said:

"Such pledge, at the most, merely created a moral obligation to fulfill the same. * * * It would seem that courts do not and cannot deal with merely moral obligations as distinguished from legal obligations. Their functions are restricted to the latter." State v. Blaisdell, 18 N. D. 31, 118 N. W. 141.

Such a ballot in the general election must be counted, regardless of any and all party obligations or promises, whether kept or broken. Consequently, in no proper *legal* sense can it be said, fairly, that participation, in a party primary, of those who are not qualified voters in the general election may affect either the validity or the result of such general election, and, consequently, is inhibited by our Constitution. Obviously that conclusion is sound in all instances, whether such nomination in a primary election be or be not equivalent, practically, to a final election. As to its constitutionality, the status of a party primary is, at all times,

Tex.) KOY v. SCHNEIDER **917**

a fixed quantity, regardless of the ebb and flow of political opinion.

In the second place, the supporting argument does not reach the marrow of the present question, which relates solely to *the power of the Legislature* to authorize women to vote in primary elections, rather than to the construction of those statutes. If it be conceded that by the terms of the general primary election statute none but males are allowed to vote in party primaries, the fact remains that said statute of 1918 undertakes to confer that privilege upon women also; and certainly that later provision, to the extent of irreconcilable conflict (if any), is of controlling force, and should be held *valid,* unless clearly *inhibited* by the Constitution itself. That proposition is wholly unaffected by any inconsistency, apparent or real, between those statutes growing out of failure of the Legislature to eliminate from the earlier statute the provision that the participant in the primary election shall be pledged to "support" the nominees of that primary.

Any and all questions concerning the legal effect of such party pledge, as related to votes of women in party primaries, are purely questions of *statutory construction,* and do not go to the authority of the Legislature to enact such statutes, and, consequently, do not reach the present issue as to the *validity* of said statute of 1918. Nor is that single issue controlled or affected by statutory provisions prescribing punishment for voting illegally; hence all suggestions on that score are, presently, inapplicable.

Contending that reasonable party tests may be applied in party primaries, consistently with their purpose, and consistently with the application of the constitutional definition of "electors" to them, the argument in support of said motion challenges the view expressed in the original opinion of this court to the effect that application of the strict letter of our suffrage clause to party primaries would destroy them, by admitting to participation therein all who are qualified to vote in the general election, regardless of their party views. Upon careful reconsideration of that feature, the former conclusion of this court is considered sound, and supported by the better reasoning, as well as by many authorities, as hereinabove shown, although there are cases to the contrary.

The argument in support of said motion (like said dissenting opinion) presents the view that, inasmuch as "primary elections" are treated everywhere as being public "elections" in such sense and to such extent as to justify the enactment of laws extending over them the police powers of the state (Baer v. Gore, 79 W. Va. 50, 90 S. E. 530, L. R. A. 1917B, 728; Hopper v. Stack, 69 N. J. Law, 569, 56 Atl. 1; State v. Felton, 77 Ohio St. 554, 84 N. E. 85, 12 Ann. Cas. 65; Riter v. Douglass, 32 Nev. 400, 109 Pac. 444), they must be "elections" in contemplation of our suffrage clause. But are not elections of domestic corporations (both of stockholders and of directors) regulated *by statute,* and is not the police power of the state plainly applicable to them also? As well might it be held that, from said considerations, our suffrage clause is applicable to those corporation elections, with the legal result that no female stockholder and no nonresident stockholder may vote in them. Fairly the illustration may be extended to include certain fraternal and benevolent organizations. The argument on said motion quotes, in its support, from 9 Ruling Case Law, p. 1074; but the excerpt is not in harmony with most of the pertinent decisions throughout the country.

[24] Without giving due effect to the established rule that words in a Constitution speak as from date of their *original insertion* in the organic law, unless it be provided otherwise therein, the argument on said motion mentions various primary election measures which had been introduced in our Legislature prior to the amendment of our suffrage clause in 1902, and also our general primary election statute of 1895. Thereupon it is argued that said amendment ought to be treated by the courts as having been adopted in contemplation of "primary elections," with the legal result that at least from and after adoption of that amendment the word "election" in our suffrage clause should be held to include primary elections as well as general elections. But if it was, indeed, the purpose of the people, in adopting said amendment of 1902, thereby to change the historic meaning of "election" in that article (so as to make it include thenceforth, as that argument assumes, "primary elections" and "primary conventions"), is it not passing strange that they made therein no mention whatever of political parties, or of party affairs, or of "primary elections," or of "primary conventions"? A direct treatment, in the amendment, of the subject upon which (appellee assumes) such contemplated change in meaning was to operate would have been more natural, more candid, more certainly efficacious, and decidedly more probable. Such direct and open language is customarily employed, in Texas and elsewhere, in amending Constitutions. Particularly is that true as to amendments in various states carrying provisions intended to include or affect primary elections.

Our suffrage article, as originally adopted in 1876, in defining one class of qualified electors, used the language "who, *at any time* before an election, shall have declared his intention to become a citizen," etc. In 1896 that quoted language was changed to read "who, *not less than six months* before any election at which he offers to vote, shall have declared his intention to become a citizen," etc. Obviously that change concerned only that *one class* of voters, and, even as to them, the only legal effect of the change was to extend

to a date more anterior to the election the required declaration of intention.

The amendment of said suffrage clause in 1902 consisted solely in an addition relating to poll taxes. Although affecting all classes of "qualified electors" (whatever that term may mean), that addition could not rationally have been designed to affect, as to any one, the privilege of suffrage in any other respect. In each instance the proposed change was so understood by the people, and no ulterior or different purpose—such as extending to purely party affairs the meaning of "election" —was reasonably in the minds of the people in voting upon such amendment.

To hold otherwise would be entirely unwarranted, and shockingly would violate all applicable rules of construction. According to common sense and fairness, the meaning of "election," as it stands now in that suffrage clause, must be tested as of date of its original insertion in that section 2, in 1876, as assumed in said original opinion in this case, and also in said dissenting opinion. "Steadily and unfailingly," since 1876, it has meant just what it meant then.

This does not mean that words employed in a Constitution or statute ought never to be held to include any matter not actually within contemplation or knowledge of its makers at date of its adoption. On the contrary, it does sometimes happen that a certain word, whether in a statute or a Constitution, may be found to have been therein used in a sense broad enough to include things not then within human experience or knowledge; and especially is that true of words of generic import—such, for illustration, as "insurance," which may include classes of insurance not yet devised. People ex rel. Kasson v. Rose, Secretary of State, 174 Ill. 310, 51 N. E. 246, 42 L. R. A. 124. See, also, South Carolina v. U. S., 199 U. S. 437, 26 Sup. Ct. 110, 50 L. Ed. 261, 4 Ann. Cas. 737; Spikerman v. Goddard, 182 Ind. 523, 107 N. E. 2, L. R. A. 1915C, 513. Just so, and consistently, the word "election," in our suffrage clause, being itself of generic significance, is concededly applicable to various kinds of elections which, it may be assumed, were not actually in contemplation of the makers of our Constitution when it was framed and adopted, provided, always, that each such included election be a real and final election for some strictly and purely "governmental" purpose. Just there the line of demarcation was clearly drawn in Waples v. Marrast and in Beene v. Waples, supra. In many other states, as shown by numerous cases cited in said majority opinion in this case and hereinabove, that line has been so drawn as to make substantially similar suffrage clauses include, in certain states, only such elections as were expressly provided for by their Constitutions, and, in other states (still more exclusively), only elections for "public officers" expressly provided by their Constitutions. In none of those instances was the word "elections" applied in its broad and etymological signification, as this court is urged to apply it in this case, and as our Chief Justice insists it should be applied. So, as applied to the case, the foregoing proposition as to the date from which the legal effect of "election" in our suffrage clause is to be considered means, simply, that the legal signification of "election" in that clause remains wholly unaffected by said amendments of that section 2.

Nor is there anything new in that idea. In Cox v. Robison, 105 Tex. 426, 127 S. W. 806 (the opinion being by our present Chief Justice), this court, after tracing the history of "releases" and "owners" through successive Constitutions of this state, in order properly to construe those words, declared:

"The readoption in a subsequent Constitution of a provision found in the Constitution that it supersedes is presumed to have been with a purpose not to change the law, and the use of the same language is presumed to have been with the same intent. Cooley, Const. Lim. 75; Muench v. Oppenheimer, 86 Tex. 568; State v. Board of Assessors, 35 La. Ann. 651."

In that cited Muench Case, this court, through Mr. Justice Gaines, applied the same rule as between amended section 8 of said judiciary article 5, as amended in 1891, and unamended section 22 of that article, and by Judge Cooley's cited great work the same rule was thus extended to unchanged words of the same amended section of a Constitution:

"When a Constitution is revised or amended, * * * if the new instrument re-enacts in the same words provisions which it supersedes, it is a reasonable presumption that the purpose was not to change the law in these particulars, but to continue it in uninterrupted operation. This is the rule in the case of statutes. * * * Its application to the case of an amended or revised Constitution would seem to be unquestionable."

The attempt, in the argument on said motion, to break the force of the former decision of this court in Waples v. Marrast, supra, as applied to the present case, is labored and ineffectual. That argument concedes that the "purpose" of the election was there held to be of controlling force in determining whether two certain sections of our Constitution are or are not applicable to primary elections. Said argument does not explain why (if at all) the same tests do not likewise properly determine whether another section of the same written instrument (section 2 of article 6), our suffrage clause, is or is not applicable to primary elections.

That payment from public funds of expenses of primary elections "has no relation to the question" now before this court is asserted in said argument; but directly and strongly to the contrary was the opinion of

the Supreme Court in Spier v. Baker, supra, cited in the brief of the tax collector (and relied upon by our Chief Justice), wherein that feature of their system of laws, which was held permissible under *their Constitution*, was treated by the California court as *highly material* in determining whether primary elections were or were not within the meaning and legal operation of the word "elections" in their suffrage clause. See, also, Labauve v. Michel, 121 La. 374, 46 South. 430. A careful re-examination of each of the cases cited in behalf or the tax collector fails to develop any sound reason for denying the authority of the Legislature validly to enact said statute of 1918.

The printed argument in support of said motion closes with comments of the president of a woman's suffrage association of another state concerning a decision of its Supreme Court construing an amendment of its Constitution, and an extract from an editorial comment of a leading newspaper of this state criticizing the decision in this case and approving the dissenting opinion therein. Whatever may be the tenor of such matter in support of or against a decision of the court in a cause still pending, and whatever may be considered its intrinsic weight, the practice of embodying such matter in file papers, such as motions and arguments, is disapproved.

The pending issue has these two distinct phases:

(1) As to reasonable doubt concerning the *power* of the Legislature validly to enact said statute of 1918.

(2) On the merits of the issue, as to the *legal* meaning of "election" in our suffrage clause.

From what has been shown in the original majority opinion in this case, and herein, it must be evident that the two independent lines of inquiry and reasoning ultimately converge and blend into one common and indisputable conclusion that the statute of 1918 here under review ought not to be declared unconstitutional. In view of the judicial Texas history of the pending issue, and in view of the conflicting decisions of so many courts of other states, with so many dissenting opinions thereon, the insistence, in said dissenting opinion in the present case, that said statute is *clearly* unconstitutional beyond a reasonable doubt, that "election," in our suffrage clause, is so utterly unambiguous as not to admit of construction, seems not well founded; and, in view of the hereinabove cited applicable and controlling prior decisions of this court, reinforced as they are by so many strong decisions from other states, the solemn declaration by our Chief Justice that the decision in this case "subverts the Constitution of this state and makes of it a vain and useless document" seems, as Mark Twain termed the reports of his own death, somewhat exaggerated.

Fortunately, in answering the certified question, this court has not played the rôle of pioneer. Happily its own independent prevailing conclusions run, not counter to, but with, the thread of the great current of judicial decisions, in Texas and elsewhere.

The certified question is direct and searching. Its candid and dispassionate judicial answer rests in the normal and correct application of certain simple elementary and fundamental legal principles, and certain carefully wrought out and long-established rules for the construction of Constitutions. Those elementary principles and those rules of construction are not vague, shadowy, indefinite, or unformulated, and, consequently, subject to varying and conflicting expression; they are substantial, concrete, of definite mold, of fixed and terse expression, of clear and unequivocal meaning. Those principles and rules, in the form of their expression, are almost as well established and generally accepted as are the fixed and universal principles and rules of the arts and sciences, or the elementary and constructive rules of mathematics. They stand approved by practically all text-writers and courts. Consequently, in the statement of them there is no occasion for confusion or disagreement, no matter what differences may arise in applying them to the present issue.

Moreover, those applicable and controlling principles and rules of construction had assumed their present form of expression, and had attained, in the estimation of nearly all authorities everywhere, the rank and dignity of immutable and universal principles of law, long before our Constitution was framed or adopted, and must therefore be assumed and treated by the courts as having been present in the minds of the members of the constitutional convention in framing that expression of our organic law, and also in the minds of the people of Texas in adopting it, thereby giving it vitality and power.

Inevitably, therefore, in construing and applying ambiguous provisions of that sacred instrument, such as its suffrage clause demonstrably is, a duty which, under our form of government, rests, in the last analysis, upon this court, it is its highest and most important duty intelligently and tirelessly and faithfully to seek out and find, and unflinchingly to apply, such established, applicable, and controlling principles and rules of construction, and to determine the pending issue accordingly. In the original opinion of this court in this case, and again herein, that has been attempted, with identical results.

When so considered, the certified question reasonably admits of none but a negative reply. To that effect was the original decision; so it will not be disturbed.

The motion is overruled.

PHILLIPS, C. J., dissenting.